## THE LISCARD.

### COMPANHIA DE MOAGENS DO BARRIERO v. LONDON ASSUR. CO.

### SAME v. MANHEIM INS. CO.

(District Court, E. D. Pennsylvania. May 12, 1893.)

1. MARINE INSURANCE—CARGO—WHEN POLICY ATTACHES.
   A marine policy on a cargo of wheat "at and from New York and bound for Lisbon" attaches while the wheat is in harbor at New York, immediately upon loading.

2. SAME—PARTICULAR AVERAGE CLAUSE.
   Under a marine policy against all sea peril, loss and damage to cargo, except as provided in the clause, "Free of particular average unless the vessel be stranded, sunk, burned, or in collision," the exception ceases to operate as soon as the vessel had been stranded or in collision, whether the subsequent loss is caused thereby, or by some other cause.

3. SAME—COLLISION IN HARBOR.
   There is a "collision," within the meaning of such a policy, when the vessel, being fully loaded, has once cast off her moorings, but has returned to her dock because of a difficulty with her engines, and is there struck by a scow, which makes a slight break in her bulwarks.

In Admiralty. Libels by the Companhia de Moagens do Barriero against the London Assurance Company and the Manheim Insurance Company of Manheim on marine policies on the cargo of the steamer Liscard. Decrees for libelants.

Curtis Tilton and John F. Lewis, for libelants.
Morton P. Henry, for respondents.

BUTLER, District Judge. I find the libelants' statement of facts substantially correct. On December 10, 1890, the libelants, through Lawrence Johnson & Co., of Philadelphia, shipped on board the steamer Liscard, at New York, bound for Lisbon, Portugal, 33,000 bushels of wheat in bulk, and 1,542 bags, valued at $40,887; and for and at the expense and request of libelants the said Lawrence Johnson & Co. insured the said wheat in the Manheim Insurance Company for said voyage, in the sum of $10,000. The wheat was purchased by libelants from Lawrence Johnson & Co., and as soon as loaded on board ship was by the terms of sale, the property of libelants. The bills of lading and certificates of insurance were made out in the names Lawrence Johnson & Co., the cargo being delivered and insurance payable to their order, and the papers were by them indorsed in bank. The payment for cargo was made through a credit opened by the libelants with London bankers, to whom the bills of lading and certificates of insurance went in passing from Lawrence Johnson & Co. to the libelants. The wheat was invoiced to libelants and the premium for insurance charged against them in the invoice.

Another lot of 33,000 bushels of wheat, valued at $40,887, was shipped on the same steamer by libelants, and insured by the London Assurance Co., for said voyage, for the sum of $20,000, the terms, conditions, and manner of shipment and insurance being the same

as to both lots, which were separated in the ship, and kept separate thereafter. Excepting as to the amount of libelants' claim, the case against the Manheim Company is the same as that against the London Assurance. The underwriters are both foreign companies and their method of business is to issue to their American agents open policies of insurance, for account of whom it may concern. Under these open policies their agents issue to the assured short certificates which stipulate as follows:

"This certificate represents and takes the place of the policy and conveys all the right of the original policy holder, for the purpose of collecting any loss or claim, as fully as if the property was covered by a special policy direct to the holder of this certificate."

The certificate and policy taken together contain the contract of insurance. Under the terms of this contract, the underwriters are liable for all kinds of sea peril, losses and damages to the wheat, whether partial or total, except as provided in the following clause:

"Free of particular average unless the vessel be stranded, sunk, burned or in collision."

The Liscard, while in the harbor of New York, after the insurances had attached, was run into by a scow or lighter, in tow of the George Carnie. Before the collision the steamer was fully loaded; her bills of lading had all been signed and delivered to libelants, and she had made every preparation to leave port; had cast off her mooring lines for the purpose of starting to sea, but in consequence of some trifling difficulty with her engines she again made fast to the wharf. The collision occurred after thus remooring. A break was made by the collision in the inclosed iron side of the steamer above her deck, called the "bulwark," of considerable length and open from one and a half to one and a quarter inches, a part of the distance. The steamer was duly surveyed before starting out, and pronounced seaworthy. In the course of her voyage she encountered very rough weather, which lasted for several days, and opened the seams of her deck, letting water in upon the wheat. Water passed in also through the hatches, from which canvas covers had been torn by the storm. Eventually her engines gave out under the strain, and she returned in distress to Boston. The wheat was there discharged, and found to be seriously damaged. Surveyors reported that no part of it was fit for further transportation, and recommended a sale. On February 2d, Lawrence Johnson & Co. and the master agreed that the voyage should be terminated and the cargo received at Boston. The insurers assented on condition that the rights of neither party to the policies should be affected thereby. The wheat covered by the London Assurance Co. was sold for $28,554.15, which deducted from the valuation, $40,887.00, showed a loss of $12,332.85; while that covered by the Manheim Insurance Company's policy sold for $27,851.25, which being deducted from the valuation, $40,887.00, showed a loss of $13,305.25. Parts of these balances have been paid by other companies having policies on the cargo. The libelants rendered serv-

ices and incurred expenses under the "sue and labor" clause of the policies, for which also they seek recovery. The policies attached while the wheat was in harbor at New York, immediately on loading. In the language employed it was insured "at and from New York and bound for Lisbon."

There is no controversy about the material facts. The single question is one of law, and arises out of the terms of the clause above quoted respecting "particular average," or partial loss. If the question was new it would be embarrassing. It is very old, however, having arisen and been decided in England more than a century ago; and the decision then made has been adhered to without variation ever since. The clause originally was confined to cases of "stranding," but was quickly extended to cases of burning and collision as well. Its introduction in the peculiar form here found, soon gave rise to litigation; the insured contending that if stranding, burning, or collision occurs during the voyage, whether the loss be attributable to it or not, the policy is to be read as if this conditional limitation had been omitted; and the insurer contending that the clause contemplates only such stranding, burning, or collision as causes the loss. The English courts, after full discussion and consideration, adopted the former view, giving to the language a strict, literal, interpretation; and notwithstanding the repeated efforts subsequently made to procure a reversal, the decision has been adhered to with pertinacity and steadiness to this day. Lown. Mar. Ins. 319, 320, says:

"A stranding at any time during the voyage is sufficient. It is of no consequence whether this causes the damages or not. The injury to the ship may be repaired before the damage to the cargo occurs. A stranding during the voyage (without regard to its consequences) operates to efface the clause from the policy."

McArthur, Mar. Ins. 283–285; Pars. Mar. Ins. 630, 631; and Arn. Mar. Ins.,—say substantially the same. The decisions, and the reasons on which they are founded, are so fully stated by these authors that it would be a waste of labor to say more about them.

In the United States the question has not been raised, doubtless, because parties here have acquiesced in its decision as stated, elsewhere. However reasonable a different construction of the clause might have been in the commencement, it would be most unreasonable now. As the proofs show, and as would be inferred in their absence, insurers and insured contract with reference to this construction. Where the insurer desires to vary the risk he varies the language, and the premium demanded, accordingly. If he intends to limit his liability for partial loss to cases in which such loss is attributable to the stranding, burning, or collision, he says so and charges a diminished premium. A departure from the established construction now would, therefore, work great injustice to the insured. While paying for one risk, he would be secured against another of less importance. I cannot doubt that the courts of this country will follow those of England on this

subject. The importance of uniformity in the rules respecting commerce, and kindred subjects, in this country and that, cannot be overstated. The circumstance that some differences exist now affords no support for an argument in favor of others. Buzby v. Insurance Co., 31 Fed. Rep. 422.

It is not denied that a "collision," in the admiralty sense of the term, occurred during the risk, in this case. It is denied, however, that it was such a collision as the policy contemplates; because, as is contended, it had not, and could not have, any connection with the loss sustained; and because also it occurred at New York. This is however, I think, the old question, presented under slightly varied circumstances; and the decisions referred to cover it. As we have seen it is of no consequence whether the collision led to the loss, or might have led to it, or not. The contract does not say it shall—to fix the insurer's liability for "particular average," and the strict interpretation referred to was adopted because the language is the insurer's, and because, also, it avoids the danger which must result from groping after unexpressed intentions; and furthermore saves the insured from the necessity of producing proofs such as must always be difficult, and often impossible, of attainment. In many cases the loss may result from previous stranding or collision and leave no evidence of the fact. The visible effects of such accidents may be unimportant, and yet the hidden consequences be serious. If this collision had occurred at sea I can hardly believe it would be urged that the policy does not embrace it. If it would, then what description of collision, short of one entailing the loss, is embraced? The authorities cited show that any accidental stranding, burning, or collision, no matter how slight, is within the clause. If the stranding is but momentary, or the burning consumes but slightly any material part of the vessel it is sufficient. All attempts to find a resting place, or draw a line, between the simple occurrence of such accidents and their occurrence with attendant loss, must lead simply to confusion. Where would the line be placed—by what rule would it be fixed? It has been urged in some instances that the stranding or burning, etc., should be "serious." But what does this term, in such connection, signify? Not that it shall be serious as respects the loss insured against; that is admitted. As respects the ship all such accidents are serious; they involve her safety and threaten destruction, though she may escape with little injury, or none. And then again, how is to be known, as before suggested, that serious hidden injury is not inflicted—such as the tempests alone will develop? It has also been contended that the consequences should be such as to disable the ship and temporarily suspend navigation. But of what importance is this to the insurer, if it has no connection with the loss? And why draw the line here rather than elsewhere? The purpose of the construction referred to was to avoid all such speculation and uncertainty.

Nor does the policy say where the collision shall occur. Why,

therefore, should we hold that such an occurrence at New York, after the risk attached, is excluded? If it had sunk the vessel, or otherwise injured the cargo there, it would certainly have rendered the insurers liable for a partial loss,—which could not be if the collision was not such as the policy contemplated. It is urged that there is a difference between the port risk and the sea risk. The difference, however, is simply in kind. That the insured is not subject to an implied warranty of seaworthiness while in port, is immaterial to the question. The contract is entire, and admits of no such division of the insurer's responsibility as is set up. The collision did not affect the vessel's seaworthiness; she was still capable of resisting ordinary storms; and is not therefore blamable for starting on her voyage. Such an accident in port might be sufficiently serious to strain and weaken a vessel so as to incapacitate her to resist extraordinary tempests, without rendering her unseaworthy. Such straining and weakening might be invisible to surveyors, and yet cause the loss of her cargo at sea. I cannot, therefore, (and in view of the authorities,) attach importance to the fact that the only visible effect of this collision was the breaking of her bulwarks; and that it occurred at New York. But even this effect seems to have contributed to the loss, for according to the proofs some of the water entered the deck by means of this break, and ran through its seams and hatches upon the cargo. True the damages might have been as great if the break had not existed; for the sea strained the vessel from stem to stern and swept her decks with floods of water. Nevertheless the fact remains that the break in the bulwark probably, if not certainly, contributed to the damages. The view I entertain of the case, however, renders the fact unimportant. I regard every question raised as covered fully by the decisions above referred to, and do not therefore see anything open to discussion except the question whether we are to depart from uniformly recognized construction of the clause involved, after insurers and insured have conformed their contracts to it; and about this I have no doubt.

A decree must therefore be entered sustaining the libel.