# LONDON ASSURANCE v. COMPANHIA DE MOA-GENS DO BARREIRO.

CERTIORARI TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 280.   Argued April 20, 21, 1897. — Decided May 10, 1897.

A cargo of wheat shipped on a British steamer at New York, for Lisbon, was insured by an English assurance company through its agents in Philadelphia "free of particular average unless the vessel be sunk, burned, stranded or in collision"; all losses to be paid in sterling at the offices of the corporation in London; "claims to be adjusted according to the usages of Lloyds." The cargo was loaded and the lines were cast off, ready to sail, when it was found that there was a defect in the machinery, which detained them a few hours. During the detention a lighter, being towed out of the dock, ran into the steamer, breaking two plates in the bulwarks and doing other damage. This resulted in a farther detention of two days. After sailing, the steamer encountered heavy gales and seas. She took large quantities of water on her decks, some of which came through the cracks caused by the collision, and was so strained that the water got into the wheat. The machinery becoming strained the captain made for Boston, and on arrival there had a survey made, which resulted in the taking out of the cargo, and its sale for the benefit of all concerned. This libel was then filed by the owners of the cargo to recover for their loss. The District Court gave judgment in favor of the owners, and referred it to a commissioner to assess the damages, and gave judgment accordingly. The Court of Appeals having affirmed that judgment, it was brought here by writ of certiorari, for review. *Held,*

(1) That under the circumstances the contract of insurance was to be interpreted according to English law;

(2) That, if a ship be once in collision during the adventure, after the goods are on board, the insurers are, by the law of England, liable for a loss covered by the general words in the policy, although such loss is not the result of the original collision, and, but for the collision, would have been within the exception contained in the memorandum, and free from particular average as therein provided;

(3) That the question whether the law of this country does or does not accord with the law of England in this matter does not arise in this case, and no opinion is expressed on that question;

(4) That under the facts stated in the opinion of the court, the cargo was necessarily sold at the port of refuge, and the loss, under such circumstances, should be adjusted as a salvage loss.

THE respondents herein duly filed their libel in admiralty against the appellant, the London Assurance, in the United States District Court for the Eastern District of Pennsylvania, in a cause of marine insurance, to recover upon a policy of insurance issued by the company upon some 33,000 (being part of a cargo of about 80,000) bushels of wheat, of which the respondents were the owners, the 33,000 bushels being valued in the policy at $40,887. The policy was dated December 8, 1890, was issued for $20,000, and covered the wheat when shipped on board the steamer Liscard, at New York, bound for Lisbon, Portugal. There was another policy upon the same wheat as that covered by the policy in suit, issued by another company, for $20,887, the total of the two making up the value of the wheat as mentioned in the policy. The policy now before the court contained the usual language as to the adventures and perils the assurers were contented to bear, among them being "perils of the seas, . . . and all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandise or any part thereof." As representing the policy, the insurers issued what is termed "its certificate" or "memorandum," wherein it was stated that the certificate "represents and takes the place of the policy, and conveys all the rights of the original policy holder (for the purpose of collecting any loss or claims), as fully as if the property was covered by a special policy, direct to the holder of this certifi-

cate." It certified that on the 8th of December, 1890, the corporation insured under policy No. 427, for Lawrence Johnson & Co. (who were the agents for the libellants), $20,000 in gold on 33,000 bushels of wheat, valued at $40,887, shipped on board the steamship Liscard, at and from New York to Lisbon, Portugal. In the body of the certificate and directly under the subject of the insurance (33,000 bushels of wheat), stamped in red ink, are the words:

"Free of particular average unless the Vessel be sunk, burned, stranded or in collision."

On the face of the certificate and on the right-hand side thereof, and at a right angle with the body of the certificate, the following language is printed:

"It is hereby Understood and Agreed that in all cases of loss or damage to the interest insured under this Certificate, the same shall be reported to the Corporation in London as soon as known or expected, and be paid in Sterling at the offices of the Corporation, No. 7 Royal Exchange, London, at the rate of four dollars and ninety-five cents ($4.95-100) Gold to the Pound Sterling. Claims to be adjusted according to the usages of Lloyds, but subject to the conditions of the Policy and Contract of Insurance."

Immediately underneath and also printed in red ink is the following:

"NOTICE: To conform with the Revenue Laws of Great Britain, in order to collect a claim under this Certificate, it must be stamped within ten days after its receipt in the United Kingdom."

The certificate is signed by the agents of the company at the Philadelphia agency.

The cargo was received on board the steamship in New York harbor, and the loading of the vessel had been completed and she was ready on December 12, 1890, to proceed on her voyage; the lines had been cast off and the steamer would have then left the dock, but that at the last moment some little derangement to her machinery occurred and she was temporarily delayed in order to remedy the difficulty, which was accomplished in a very short time — some few

hours. While thus fully loaded and in readiness to proceed
on her voyage a collision occurred, which is thus described
by the chief officer and entered in the log-book by him:

"At 8.15 P.M. a lighter, being towed out of the dock by the
tug George Carnie, ran into us breaking two plates in the bul-
warks, bending stanchions, starting main rail, etc. Anchor
watch kept all night."

The two plates referred to were of iron half an inch thick.
The damage to the ship was surveyed before she left New
York by one of Lloyd's surveyors, who made a written re-
port in regard to it. The break in the bulwarks caused by
the collision was on the port side of the steamer about
abreast of her mainmast. As described by a witness: "The
break was of an irregular shape and eleven feet six inches
long, where the measurements followed in the line of the
break. The break was a continuous one in two of the iron
plates of the bulwarks." "It began a little above a fore and
aft line, half way between the deck and the top of the bul-
warks, and descended to about eight inches above the deck
at its lowest point. For the first two feet, beginning from
the forward end of the break, it showed an opening of from
one half an inch to one inch; for the next three feet the
break was open one and a half inches; for the next four
feet the break was open from one half to one and a quarter
inches, and the after end of the break for one foot and six
inches was open but slightly. A spur extended from about
the middle of the break upwards for one foot."

Another witness said: "The broken plates showed signs
at the time I examined them of having been pressed, driven
or pounded together in such a way as to reduce the size of
the opening, and the carpenter of the ship stated to me at
the time that such had been in fact done. The collision
break was in the bulwarks of the vessel, and in my opinion,
as the deck of that ship is arranged, the bulwarks form an
important and essential part of the hull of the steamer. In
some cases the bulwarks are dispensed with and an open
rail used, but those are cases of flush-deck vessels, the entire
length of whose deck stands well out of the water. Such

vessels have, as a rule, but a comparatively small portion of their houses, engine rooms, galleys, etc., above deck, but in the case of a vessel like the Liscard, where all her houses are upon the deck, and her main deck is, comparatively speaking, low, and I mean low as compared with the upper deck of flush-deck vessels, the bulwarks form an important part of and a protection to the ship in keeping the water off the decks and protecting the houses and seamen. . . . Among other things, a large quantity of water in a gale accompanied by high seas would go through the break in the steamer's bulwarks which I inspected, and with the break open to the extent shown in the survey and drawing made by Mr. Candage, many seas which would not be high enough to go over the rail would send a large quantity of water through this break, and if the storm were extraordinarily severe would overtax the capacity of the scuppers to relieve the deck. Except in such case of extraordinary weather the break would be unimportant; it would not render the ship unseaworthy."

Other witnesses called by the company gave their opinion that the bulwarks were sometimes a detriment to the ship in relation to her safety, as they kept the water on the deck longer than would be the case in their absence, and sometimes that might be a very serious occurrence.

There seemed to be a general agreement, however, among the witnesses, that in steamers built as the Liscard was the bulwarks were necessary in heavy weather for the safety of the crew that was working her. The bulwarks are a part of the hull of the vessel, and are built by the shipwright in constructing the hull, and are a part of the design of the vessel when she is modelled. In the class of vessels to which the Liscard belonged the testimony seems to show that the bulwarks are indispensable.

A claim for damages to the amount of $250 was made by the captain of the Liscard and paid by the offending vessel.

The steamer was detained by reason of the collision, and sailed a couple of days thereafter. She encountered very heavy gales soon after leaving port; the seas continuously

swept over her, and finally started the seams in her decks, washed off the tarpaulins which had been placed over the hatches and battened down, and resulted in great damage to the wheat from the sea water pouring over it through the deck seams and hatches of the ship. Her seams opened on account of the excessive straining of the ship, caused by the heavy gales of wind. Some of the water that came on her decks came through the cracks in the plates constituting a portion of the bulwarks already mentioned. After experiencing very heavy weather for a number of days, the high-pressure engine became disabled, and, proceeding then with the low-pressure engine, the captain decided to make for the nearest port, which was Boston. When they arrived at that port and examined the machinery, it was found that the high-pressure piston had been bent, and the bending was caused by the excessive straining of the ship, caused by her laboring and rolling in the seas. Upon his arrival in Boston the captain requested a survey to be made, which was done, and the cargo taken out and a written report and recommendation made. It was found that the wheat had been damaged by sea water in all the holds of the ship, and after considerable negotiation between the agents of the ship, the owners of the cargo and the insurers, an agreement was made for the breaking up of the voyage at Boston, and part freight on the cargo was paid the steamer with the written assent of the insurance company.

The cargo was sold for the benefit of all concerned, and a claim made upon the insurers under the policy, who denied any liability whatever. The owners of the wheat thereupon filed their libel in admiralty in the District Court to recover for the loss sustained by reason of the facts above mentioned. The District Court gave judgment in favor of the owners of the wheat, 56 Fed. Rep. 44, and referred it to a commissioner to assess the damages, who adopted a rule for the adjustment of the loss, which is referred to in the following opinion. The company appealed to the United States Circuit Court of Appeals for the Third Circuit, which court affirmed the judgment of the District Court. 28 U. S. App. 439. The insurance

company then applied to this court and obtained a writ of certiorari to review the judgment.

*Mr. W. W. MacFarland* (with whom was *Mr. William Parkin* on the brief) for the London Assurance.

*Mr. John F. Lewis* for the Companhia de Moagens do Barreiro.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

Two questions arise in this case in regard to the liability of the insurers upon the policy in suit: the one being whether what took place before the vessel left her berth in New York amounted to a collision within the meaning of the policy; the other being whether, in case there was a collision, the company is liable for a subsequent loss which did not in any way occur by reason or arise out of the collision.

As to the first, we think that the vessel was "in collision" within the meaning of the language used in the certificate which represented and took the place of the policy. It was not necessary that the vessel should itself be in motion at the time of the collision. If while anchored in the harbor a vessel is run into by another vessel, it would certainly be said that the two vessels had been in collision, although one was at anchor and the other was in motion. We see no distinction, so far as this question is concerned, between a vessel at anchor and one at the wharf fully loaded and in entire readiness to proceed upon her voyage, with steam up and simply awaiting the regulation of some insignificant matter about the machinery before moving out. If, while so stationary (at anchor or at wharf), the vessel is run into by another, we should certainly, in the ordinary use of language, say that she had been in collision. How important or material were the results of the collision in regard to the condition in which the vessel was left, would be a matter of further and more detailed description. The ordinary meaning of the words "in collision,"

when applied to a vessel, does not require that the result of
the impact shall be so far reaching as to impair her seawor-
thiness. Very serious results, in the matter of expense of
repairing, at least, might follow from the impact, wherein the
seaworthiness of the vessel would not be at all impaired, and
yet no one would doubt that, within the ordinary meaning of
the words, such a ship had been in collision.

It is impossible, as we think, to give a certain and definite
meaning to the words " in collision," or to so limit their mean-
ing as to plainly describe in advance that which shall and that
which shall not amount to a collision, within the meaning of
this policy. The difficulty of limitation or description is much
the same in kind as that pertaining to another expression in
the same memorandum in regard to when a vessel is " burned."
It is, however, obvious that a vessel would be said to have
been in collision when the effect upon the vessel, or the evi-
dence of such collision, might be very much less than would
be necessary to exist in a case of fire before one would de-
scribe a vessel as a *burned* vessel. In the case of *The Glen-
livet* (1893, Prob. 164; same case on appeal, 1894, Prob. 48),
the question arose as to whether the vessel was " burned "
within the meaning of this language in the memorandum.
There had been a fire on three several occasions among the
coals in the bunkers of the ship, and some small damage to
the ship by fire took place on two voyages, and the ques-
tion was whether, under the circumstances, the ship was
burnt within the meaning of the memorandum. Lord Justice
Smith, in the Court of Appeals, in the course of his judgment,
said :

" Suppose the cabin curtains were burnt, he should have
told the jury that that did not constitute a ' burnt ' ship ; but
suppose the after part of the ship was burnt altogether, and
the fore part was not burnt at all, I think he should have told
them that they might, if they liked, find that was a ' burnt '
ship, although there was only a partial burning.

" It seems to me impossible to lay down absolutely in the
affirmative or the negative as to whether a partial burning
does constitute a ' burnt ' ship or not within this policy ; it

may or may not, according to the actual facts appertaining to the partial burning."

Further on in the course of his judgment, in speaking in regard to the directions to be given to the jury, he said:

" My own view is that you would have to tell the jury what I have already said about partial burning, and then you would have to tell them that a partial burning may, under some circumstances, constitute a ' burnt' ship, and may not under other circumstances, and having given that direction you would have to ask them, Has the fire been such as to bring the ship to such a condition that you consider her a ' burnt' ship within the ordinary meaning of the English language?

" This, in my judgment, is the nearest direction which can be given as to what is meant by a ' burnt' ship in the memorandum; it is not possible to lay down any hard and fast rule upon the subject."

Lord Justice Davey said:

" Counsel for the plaintiffs says that the clause applies if a fire breaks out in any part of a ship or stores, although it is got under before any great amount of damage is done to the ship.

" I cannot bring myself to think that any person would, either in the accurate use of language or in ordinary parlance, say that in such a case as that the ship has been ' burnt.' "

The learned judge also said: " I think that it is really a question to be answered by the jury, Has the ship in the circumstances of this case been burnt ? "

The English court took the view that as to a burnt vessel, it must be such a burning as would constitute the vessel a burnt vessel within the ordinary meaning of the English language. The language is used in regard to the vessel as a whole. " The company is to be free from average unless the ship be burnt." That language would seem clearly to indicate some essential burning of the vessel itself and not such a case, as put by one of the judges, of the burning of the cabin curtains. The case is referred to for the purpose of showing that the English court held the expression was to be defined according to the ordinary meaning of the English language.

This leaves each case to be decided with reference to its own peculiar facts.

We perceive the same difficulties which confronted the English court, in the case mentioned, in defining and in accurately and precisely limiting the meaning to be given to the words "in collision," and we agree with those judges that the words contained in the memorandum are intended to be used, as Davey, Lord Justice, said, "in accordance with the ordinary use of language," or, as said by Lord Justice Smith, "within the ordinary meaning of the English language." Taking the meaning of the words in that sense, while we cannot state in advance and in all cases what shall amount to a collision, but must leave each case for determination upon its own facts, yet it seems to us there can be no doubt that the vessel in this case had been in collision, although her seaworthiness was not impaired in the slightest degree as a result thereof. Being run into by another vessel, as a result of which cracks were made from half an inch to an inch and three quarters wide in the iron plating of her bulwarks (which were half an inch thick) for a distance of eleven feet, certainly shows a somewhat serious impact — what would be called in plain English a collision; it shows that there was no mere "grazing," but that a force sufficient to crack iron half an inch thick was exerted upon the hull of this steamship, and that it was sufficiently serious in its nature to cause the captain to have an examination of it made and a claim for damages asserted, resulting in the delay of the vessel in proceeding on her voyage of two days, and the payment of $250 as damages occasioned by such collision. In the ordinary use of the English language, would it not be proper and appropriate to describe the results to the steamship as arising from a collision? We think it would.

So in relation to the use of the word "stranded" in the same memorandum. It is said that if a ship "touches and goes" she is not stranded; *McDougle* v. *Royal Exchange Assurance*, 4 Camp. 282; but if she "touches and sticks" she is. That is, in places in which she, in the ordinary course of her navigation, is not suffered to touch. A distinction be-

tween what is regarded as a stranding and what is held not to be a stranding has been in many cases held to be a very narrow one.

In the above-cited case, decided in 1815, where a ship in the course of her voyage in going out of the harbor of New Grimsby, with a pilot on board, struck upon a rock about a cable and a half's length from the shore, and remained there on her beam end for a minute and a half, Lord Ellenborough held that it was not a stranding, and added: "There has been a curiosity in the cases about stranding not creditable to the law. A little common sense may dispose of them more satisfactorily."

Taking what seems to us to be the common-sense view, we should say that this steamer had, as a matter of fact, been in collision, although the consequences of the collision were not serious enough to affect the seaworthiness of the steamship. It is enough if within the ordinary use of language the circumstances could be fairly described as amounting to a collision. We think this is the case here. If anything more than that is required, if it must be a collision of so serious a nature as to impair the seaworthiness of the vessel, or such as might naturally lead to further injury to the ship or cargo, it is at once seen how large and broad is the field of investigation in order to determine whether the vessel has in fact been in collision within the meaning of the policy. If this be its true meaning, it is neither fairly nor reasonably expressed by the words used. It leaves open for construction in each case a question that may require long and expensive investigation to determine whether it be covered by or is outside of the policy. If the company by the use of the expression found in the policy leaves it a matter of doubt as to the true construction to be given the language, the court should lean against the construction which would limit the liability of the company. *National Bank* v. *Insurance Company*, 95 U. S. 673.

In the case cited Mr. Justice Harlan, in delivering the opinion of the court, uses this language at page 679 : "The company cannot justly complain of such a rule. Its attorneys, officers or agents prepared the policy for the purpose, we

shall assume, both of protecting the company against fraud and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself."

If a serious collision only were meant, the company could say so. We do not think it did intend to so limit the meaning of the words. We solve the problem, therefore, in regard to the construction to be given to the language used in the policy by holding that within the fair meaning of that language the steamship was in collision after the risk had attached under the policy.

The next question is whether the subsequent damage to the wheat caused by the perils of the sea and in no wise resulting from the collision can be recovered from the insurers under this policy.

Under the circumstances, we think that this contract of insurance is to be interpreted according to the English law. The appellant is an English company. It made the contract in Philadelphia, by its agents, and that contract by its terms was to be performed in England. The parties to it understood and agreed that in case of loss or damage to the interest insured under the certificate, the same was to be reported to the corporation at London and be paid in sterling at its office in the Royal Exchange in the city of London, and the claims were to be adjusted according to the usages of Lloyds, but subject to the conditions of the policy and contract of insurance.

Generally speaking, the law of the place where the contract is to be performed is the law which governs as to its validity and interpretation. Story in his work on Conflict of Laws, section 280, says: " But where the contract is, either expressly or tacitly, to be performed in any other place there the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its validity, nature, obligation and interpretation, is to be governed by the law of the place of performance. This would seem to be a result of natural justice. . . . The rule was fully recognized and acted on in a recent case by the Supreme Court of the United States,

where the court said, that the general principle, in relation to contracts made in one place to be executed in another, was well settled; that they are to be governed by the law of the place of performance."

The case referred to in the above section is *Andrews* v. *Pond*, 13 Pet. 65, in which Mr. Chief Justice Taney, in delivering the opinion of the court, said: "The general principle in relation to contracts made in one place to be executed in another is well settled. They are to be governed by the law of the place of performance — and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest without incurring the penalties of usury."

In *Bell* v. *Bruen*, 1 How. 169, a letter of guaranty was written in the United States and addressed to a house in England, and this court held that "It was an engagement to be executed in England, and must be considered and have effect according to the laws of that country," citing *Bank of the United States* v. *Daniel*, 12 Pet. 54, 55.

In *Scudder* v. *Union National Bank*, 91 U. S. 406, the broad statement of the foregoing cases was somewhat narrowed, and it was stated that the law prevailing at the place of the performance of a contract regulated matters connected with its performance, and that matters bearing upon the execution, interpretation and validity of the contract were determined by the law of the place where it was made. Even upon that limitation of the doctrine, we think, the interpretation of the contract was intended by the parties to depend upon the principles of English law as they obtained and were recognized in England by the usages prevailing at Lloyd's. This is what the parties expressly stipulated for, and it is no injustice to the company to decide its rights according to the principles of the law of the country which it has agreed to be bound by, so long as, in a case like this, the foreign law is not in any way contrary to the policy of our own. See *Liverpool & Great Western Steam Co.* v. *Phœnix Ins. Co.*, 129 U. S. 397, 446, 453.

It appears in evidence also that there were in use two well-

known forms of particular average clauses by maritime insurance companies, one or the other being usually stamped on the insurance certificates. One clause reads, " free of particular average *unless caused* by stranding, sinking, burning or collision "; the other clause reads, as in this case, " free of particular average unless the vessel be stranded, sunk, burned or in collision." The clause in use in this certificate was termed the English clause. Many agents of English companies offered either clause, and the form in use in this case was regarded as a better clause for the insured than the " caused by " clause. It did not appear, however, that the London Assurance Company used any other than the clause found in the memorandum in this case.

Referring then to the English law upon the question as to the meaning of this language, the English courts, many years ago, decided it, and that decision has been adhered to ever since. The English courts have held, and do now hold, that the expression, " free of particular average unless the vessel be stranded," meant that if a loss occurred during the adventure, although from a cause not related in any way to the stranding of the ship, the insurers were liable upon the general language of the policy.

Lord Mansfield, in one or two decisions, at *nisi prius*, had stated that it meant that the loss should arise out of the stranding. These cases were subsequently referred to in the leading case in the King's Bench of *Burnett* v. *Kensington*, decided in 1797, and reported in 7 T. R. 210. The case was as much considered as almost any in the books. It was four times tried, and upon the last occasion of its appearance in the court in banc judgments were delivered by Lord Chief Justice Kenyon, Mr. Justice Ashhurst, Mr. Justice Grose and Mr. Justice Lawrence. The Chief Justice referred to the case of *Cantillon* v. *The London Assurance Company*, tried in 1754, where the jury was formed of merchants and the trial was presided over by Lord Chief Justice Ryder. In that case, it was held that if the ship stranded the insurer was let in to claim his whole partial average loss without regard to the fact that the loss was not occasioned by the stranding. It was said that the great insurance companies in London altered

the form of their policies in consequence of the decision in the *Cantillon case.* Subsequently the words were restored. The Chief Justice, in the course of his judgment in the *Burnett case,* continued: "If it had been intended that the underwriters should only be answerable for the damage that arises in consequence of the stranding, a small variation of expression would have removed all difficulty; they would have said, 'unless for losses arising by stranding.'" And he held, and the court agreed with him, that the meaning of the memorandum "free from average unless general, or unless the ship be stranded," was that in case the ship were stranded the insurers were to be answerable for the average loss, although the loss did not occur in the slightest degree by reason of the stranding.

Mr. Justice Ashhurst stated that the memorandum was certainly couched in doubtful words, and that it was difficult to determine when the ship was stranded, or whether or not the damage to the cargo arose from the stranding, or how much the damage was owing to that cause, and he said that "it seems as if this memorandum were introduced to avoid that inquiry, and that when the ship had been stranded the underwriters' consent to ascribe the loss to that cause. . . . Those authorities having decided the point, there is now not only no reason to overset them but a 'very strong reason to induce us to support them, namely, that this construction of the policy will tend to prevent litigation."

Mr. Justice Grose said: "And that brings it to the true construction of the memorandum and of the exception to it, whether the underwriters be or be not liable for an average loss where there is a stranding, though no part of the loss arise from the stranding of the ship. I have had great difficulties in bringing my mind to decide this, because the consequence of considering this as an exception to the memorandum, as the words import, is this, that if a ship be stranded and the cargo suffers no damage whatever, and afterwards the ship meets with bad weather and the cargo sustains an average loss of 90 per cent, the underwriters are answerable for the whole of that average loss when it is admitted that no

part of it happened in consequence of the stranding. . . .
If we were to determine that the assured could only recover
for the loss that happened by the stranding, it would intro-
duce all that doubt and difficulty that the memorandum in-
tended to remove. Therefore it seems to me best to decide
this case on the plain import of the words, notwithstanding
the absurdity which I at first pointed out will follow. Be-
sides, if the parties had intended that the insurers should
not be liable to the average loss unless part of the loss hap-
pened by the stranding, they would have added words to
this effect, ' unless part of the loss happen by the stranding ';
and the omission of such words strongly induces me to deter-
mine strictly according to the words that are inserted in the
memorandum."

Mr. Justice Lawrence said that " in a case where the words
of the policy are inaccurate, and where there are inconven-
iences attending each construction, if the case has ever been
decided, I think that we ought to be guided by it." He then
refers to the case of Wilson v. Smith, 3 Burrow, 1550–1556,
in the King's Bench, in which Lord Mansfield considered that
the loss must arise by reason of the stranding, and he said
that Lord Mansfield in that case went beyond the facts of
the case then before the court. Continuing his judgment, he
referred to the case already mentioned of Cantillon v. The
London Assurance Company, in which the point had been
decided, and he said in conclusion: " Therefore as the very
question has once been decided, I think it ought to govern
our decision in this case, especially as the question arises on
the construction of an instrument so inaccurately penned as a
policy of assurance."

It thus appears that the learned judges of the court of
King's Bench a hundred years ago deliberately decided that
the damage need not be the result of the stranding of a vessel.
It also appears, from the report of the case, that they were
fully alive to what Mr. Justice Grose called the absurd result
of the construction in one aspect of the case, and while appre-
ciating the fact, they held that, taking all things into consid-
eration, the true meaning of the language of the memorandum

permitted a recovery, provided there were a stranding, though the loss was not occasioned by it.

Although the original language of the memorandum confined the exception to a stranding of the ship, it was afterwards extended so as to read, "free of particular average unless the vessel be sunk, burned, stranded or in collision." The same rule applies to all, and if the vessel be either sunk, burned, stranded or in collision, it is sufficient to render the insurer liable, although the loss does not result therefrom.

In *Harman* v. *Vaux*, 3 Campbell, 429, Lord Ellenborough held that the stranding is a condition precedent, and when that is fulfilled the warranty against particular average ceased to have operation.

In *Barrow* v. *Bell*, 4 B. & C. 736, decided in 1825, the insurer was held liable, although the cargo was not injured by the stranding, the injury having resulted from striking upon an anchor in the harbor. Abbott, Chief Justice, Bailey, Holroyd and Littledale, Justices, held the case of *Burnett* v. *Kensington*, above cited, as entirely controlling, and that the insurers were liable.

In *Kingsford* v. *Marshall*, 8 Bingham, 458, Common Pleas, decided in 1832, although the court held that in that case there was no stranding, yet Tindal, Chief Justice, recognized the general rule, and said: "The question is whether, as the goods insured fall within those in the memorandum enumerated, the present case is taken out of the exception contained in such memorandum by reason of the ship being stranded; inasmuch as it has long been settled that the words 'if the ship be stranded' are words of condition, and that if such condition happens it destroys the exception and lets in the general words of the policy. . . . For if the ship was *stranded* in *Dunkirk* harbor, an average loss upon the whole would be equally recoverable, though it had happened from perils of the sea at any former time or any other place in the course of the voyage insured." And he referred to *Burnett* v. *Kensington* as authority.

In *Thames & Mersey Marine Insurance Co.* v. *Pitts*, 1 Q. B. (1893) 476, the court in giving judgment said: "It is clear

law that it is immaterial whether the actual mischief can be traced to the stranding. . . . If the stranding takes place within the time contemplated by the parties, the insured can recover in respect of a particular average loss, whether the damage can be traced to the particular stranding or not. This proposition is not only in accordance with common sense, but is abundantly supported by authority." And he quotes from the judgment of Tindal, Chief Justice, in *Roux* v. *Salvador*, 1 Bing. N. C. 526, in which the Chief Justice said : " The general principle laid down in *Burnett* v. *Kensington*, that if the ship be stranded the insurer is liable for any average damage, though quite unconnected with the stranding, is not disputed ; the policy, after the stranding, must be construed as if no such warranty had been written on the face of it."

In the *Thames & Mersey case, supra,* however, the court decided that where the stranding took place before the cargo was laid and the risk commenced, and the loss occurred after the loading, that the insurer was not liable. In other words, the court held that the stranding must take place in the course of the adventure, and that where it occurred before the goods were loaded and when the cargo was not at risk in the ship, the insurer was not liable.

In *The Glenlivet*, 1894, Prob. p. 48, the rule as stated by the former cases is recognized, but the court held that the clause referring to a burnt ship meant that the injury by fire was such as to constitute a substantial burning of the ship as a whole.

The English text writers on marine insurance recognize the rule to be as above stated. See 1 Marshall on Insurance, (2d Amer. from 2d London ed.) pp. 222, 234 ; Lowndes on Marine Insurance, secs. 317, 319 ; McArthur on Marine Insurance, p. 245.

It is further urged in argument that such a collision as occurred in this case ought not to be held as included in the words of the memorandum, because if it were, the greater and more serious the collision might be, extending possibly so far as to render the vessel unseaworthy, the more certainly it would appear that the company would be liable for the

subsequent loss, and hence the underwriter might be held for a loss happening by reason of the unseaworthiness of the vessel existing at the time she commenced her voyage, which would overturn the well-settled rule in such case. The answer to this argument is that the warranty that the ship is seaworthy applies to every insurance for a voyage, including insurance on cargo, notwithstanding the owner of the cargo has no power to make the ship seaworthy. The warranty is absolute, and a breach of this implied condition makes the policy wholly void, so that it is immaterial whether the loss claimed was in any way connected with the unseaworthiness or totally independent of it. (Lowndes on Marine Insurance, sec. 170; McArthur on Marine Insurance, p. 24; Marshall on Insurance, 153, 160.)

From this review of the authorities in England, there can be no doubt that if a ship be once in collision during the adventure, after the goods are on board, the insurers are by the law of England liable for a loss covered by the general words in the policy although such loss is not the result of the original collision, and but for the collision would have been within the exception contained in the memorandum, and free from particular average as therein provided. It is not material now to inquire as to the course of reasoning by which this construction of the language of the memorandum was reached. Having decided, more than a hundred years ago, what the meaning was, that meaning has been continuously attributed to the memorandum by the English courts up to the present time. The fact that the underwriters still continue its use, under such circumstances, shows that they have adopted this construction, and that they intend this meaning. Any additional exception which they have placed in the memorandum since the first decision, and which forms a part of the original exception, must be given the same meaning. Originally, the exception contained only the word "stranding," but subsequently, and at different times, the words "burned, sunk or in collision" were added to it, and they must all be given the same construction, as an exception, that has been given to the word "stranding," and, if any of them

occur, the memorandum is struck out and the general words of the policy come in force. The question of whether the law of this country does or does not accord with the law of England in this matter does not arise in this case, and we express no opinion upon that question.

Our conclusion is, that the underwriters are liable for the loss, under proper rules of adjustment.

The remaining question relates to the correctness of the method for the adjustment of the loss which has been adopted by the courts below. This depends upon the special facts which will now be referred to in some detail. The cargo consisted of about 80,000 bushels of wheat, all owned by the libellants. Of that total, the underwriters named in this action had insured 33,000 bushels, as already stated. After the arrival of the vessel at the port of Boston, in distress, the wheat was discharged into lighters for examination. A formal survey was made, and the wheat was found badly damaged by sea water, and unfit for reshipment in its then condition. The owners of the cargo gave notice of abandonment to the underwriters, which was not accepted by them, and the care of the cargo was assumed by the owners. A second survey was made on the 16th of January, 1891, and after it was made it was recommended that none of the grain be reshipped in its then condition, and it was also recommended that, as there were no facilities for reconditioning the grain at the port of Boston, it ought to be promptly sold for the benefit of all concerned. Nevertheless arrangements were entered into with persons at Boston, and such of the grain as was capable of being so treated was cleaned, separated and generally reconditioned, so far as possible, and a survey made on the 21st of February showed that as the result of this treatment the wheat had been considerably improved and saved from further deterioration, making it of greater market value than before the treatment. On February 28 another and last survey was held on the cargo, from which it appeared that about 50,000 bushels were in fair merchantable condition, though slightly damp and having a slight smell. About 17,000 bushels were slightly damp and had a smell caused by slight mixture of

damaged grains. The opinion of the surveyor was that "constant care is required to keep the property from further deterioration.; therefore, should a shipment to Lisbon be contemplated, would advise that the above-mentioned. lots be kept in separate holds or bins while in transit, and think by so doing would carry to Lisbon without further deterioration."

From the time of the arrival of the ship at Boston negotiations had been carried on between the agents of the libellants and the agents of the ship and also with the insurers, for breaking up the voyage at Boston, on the theory that the disaster which had overtaken the vessel had so damaged the cargo with reference to the port of destination that the venture was practically frustrated, and that it would cost more to carry the grain to Lisbon after being reconditioned and paying all the charges upon the cargo than the whole grain would be worth upon its arrival. The agents of the ship had been disinclined to permit the voyage to be broken up. without full payment of freight. On February 20, 1891, all the underwriters on the cargo, including this company, agreed in writing that the payment of a certain amount of freight on the damaged cargo and the acceptance and sale of the cargo by the owners should be without prejudice to any of the rights or claims the shippers of the cargo might have against the insurers, and should not be considered a waiver or acceptance of an abandonment, nor should it prejudice any defence that the insurers of the cargo might have under their contract of insurance. It was also agreed that the amount of the freight agreed upon was to be a recoverable item in any claim except for general average; but that, notwithstanding, the cargo owners might demand its allowance in general average. On the 27th of February, 1891, the agents of the ship entered into an agreement with the agents of the owners of the cargo to surrender the cargo to its owners free from liens in consideration of the payment of $3600 as full freight on the cargo. Some other conditions were imposed not material.

It also appears that the condition of affairs in relation to the shipment of wheat to Portugal was very peculiar. There was a very high duty on wheat imported into that country,

which apparently applied as well to damaged as to sound wheat. Damaged grain was unsalable there, and in many cases the authorities have not permitted it to be landed. It was difficult to establish a market price in Portugal, because but little wheat was sold there in open market, most of it being imported by millers to be ground into flour, and millers were only allowed to import and grind a certain fixed quantity of foreign wheat. Other ports of Europe, such as Liverpool and Antwerp, to which some of this wheat was subsequently shipped by its purchasers, were not subject to the same conditions. In them it seems that damaged grain might be disposed of and that it possessed a market value.

Of the wheat covered by the policy issued by this particular company there were sold at Boston for the benefit of all concerned, 32,740 8-60 bushels, the net proceeds of which amounted to $28,554.15, which, being deducted from the value of the 33,000 bushels, as named in the policy, $40,887, left $12,332.85 as the amount of the loss claimed by the libellants, as covered by the two policies upon this particular wheat, about one half of which was claimed under the policy in suit, to which were added several other charges, and then some deductions were made, making the total amount of the claim against this company $10,451.34.

The commissioner to whom it was referred, by the District Court, to assess the damages sustained by the libellants, held upon the facts given in evidence before him (most of which are above set forth) that it was proper to break up the voyage and sell the cargo in Boston, and that it was also proper to adjust the loss by deducting the amount for which the wheat sold at Boston from the value as named in the policy, and he held the insurers liable for the difference, and added other items not necessary at this time to state in detail. The commissioner treated the loss as one which is technically called a salvage loss. He found that while it was not certain that the whole cargo after being reconditioned would have been seriously deteriorated or have been wholly spoiled in a physical sense if reshipped to Lisbon, because it had been greatly improved by the reconditioning process, and possibly

might have arrived without further serious deterioration, yet in consideration of the facts applicable to this case, including all the circumstances surrounding it and above stated, the cargo should in fact be regarded as wholly spoiled in that practically it would have been almost valueless. at Lisbon owing to the peculiar laws governing that port, and he adds: "Taking the decisions of the cases and the definitions of the text writers together, a fair statement of the law applicable to this case would seem to be that the whole cargo, having been necessarily sold in Boston, for the benefit of all concerned, the underwriters are liable for the differences between the sums realized at the sale and the valuation in the policies."

The insurance company claims, if liable at all, that its liability should be adjusted with reference to the rules which obtain in cases of a particular average loss; that although in most cases that kind of a loss is adjusted at the port of destination, yet as in this case the wheat was sold in Boston at the urgent request of its owners, and the voyage broken up at that port, Boston should, therefore, be treated the same as if the policy had named that place as the port of destination instead of Lisbon, for all purposes of the risk, and in such case, where the port of destination has been reached and only a part of the cargo is damaged, the rule of adjustment must be that which obtains in the case of a particular average loss.

The rule for computing a technical particular average loss has been in existence for over a hundred years and is well known and understood. The case of *Lewis* v. *Rucker*, 2 Burrows, 1167, was decided by the court of King's Bench, Lord Mansfield delivering the judgment, in 1761, and the case of *Johnson* v. *Sheddon*, 2 East, 581, was decided by the same court in a judgment delivered by Mr. Justice Lawrence. Those cases hold that the damaged goods upon reaching their destination must be at once sold for the best price that can be had. It is then to be determined what the goods would have been worth in the same market had they been sound, and the difference between the sound value and the proceeds of the

sale of the damaged article gives the ratio of deterioration, and the underwriter is to pay this ratio or percentage of loss on the policy value. See 2 Marshall on Insurance (2d Am., from 2d London ed.) 623 ; Lowndes on Marine Insurance, sec. 269 *et seq.* ; McArthur on Marine Insurance, 207.

The company also insists that the libellants, at the time they filed their libel, did not claim as for a constructive total loss, or in other words did not claim a salvage loss, but that in their libel they described their loss as a partial one, and the company says that it was upon such issue that the question was tried before the commissioner, and that it appeared from the evidence taken before him that it was a case for the application of the strict technical rule adopted in the adjustment of a particular average loss.

We think there is no substantial ground for the contention that the libellants had not claimed a salvage loss in their libel. It is true that in the fourth clause of the libel filed by the libellants, they described the loss for which the company were bound to pay as a partial as well as a total loss, but in the third paragraph they allege an abandonment by them after the damage to the wheat and its arrival at the port of Boston, and the refusal to accept such abandonment by the company, and in the sixth paragraph of the libel they claim the right to recover the difference between the amount realized upon the sale of the wheat and the value of the wheat as stated in the policy, which they allege amounts to the sum of $10,451.34, together with claims for general average and special charges as therein stated. This is in substance a claim as for a salvage loss. In their claim before the commissioner the libellants also showed their purpose to obtain damages upon the same theory.

In regard to these conflicting claims as to the proper theory upon which the loss should be adjusted, we think, under the peculiar facts of this case, that the method adopted by the commissioner was proper. It is not denied that if a ship at an intermediate port sells a part of her cargo which has been so injured by perils insured against as that it is unfit to be carried farther, it may be sold at that port and the loss be adjusted

as a salvage loss; that is, the value of the goods stated in the policy is to be paid after deducting the amount realized on the sale of the damaged goods.

The case here presented, however, is one where the whole cargo has been sold by the assured, the cargo owner, in an intermediate port (where the voyage was broken up by common consent), and where the sale was for the benefit and with the consent of all concerned, and for the purpose of preventing greater loss. Boston cannot and ought not to be regarded as the port of destination, for any purpose. It was a port of refuge, where the whole cargo was sold instead of but a part, and it was sold in order to make the loss as small as possible. Under such circumstances is the rule of adjustment to be the same as where a part of the cargo has been damaged and necessarily sold at an intermediate port, or must the loss be adjusted by reference to the rule adopted in cases of particular average?

The voyage, it must be recollected, was not broken up or the cargo delivered to its owners for their sole benefit. Very probably they were the prime movers in proceedings for its sale, that is, in obtaining the consent of all parties interested in the cargo for its sale at Boston, but it is evident that the sale was in fact made for the mutual benefit of all. The peculiar law in relation to the importation of damaged wheat into Portugal and the seeming certainty that to carry it there under the circumstances would result in a greater loss to the insurers than to sell the wheat in Boston, renders it quite clear that it was to the interest of the insurers, as well as the owners, to terminate the voyage and sell the wheat for the benefit of all concerned at Boston.

Under these facts, it would seem to be true that this cargo, being partly damaged, was necessarily sold at the port of refuge, and that in making such sale the insurers sustained no damage, but, on the contrary, received benefits. In this state of the case we see no reason why the sale of the whole cargo should not be made upon the same principles that obtain in case of the sale at a port of refuge of that portion of the cargo which has been damaged and is unfit for transportation to

the port of destination.  In other words, we think a loss
under such facts should be adjusted as a salvage loss.  The
court below, speaking by Acheson, Circuit Judge, in this case
said:

"We have carefully examined the evidence and the legal
authorities cited and are not convinced that the commissioner
erred either in his findings of fact, or in his method of esti-
mating the loss on the cargo.  The breaking up of the voyage
and the sale of the cargo at the port of distress were not for
the benefit of the insured solely.  What was thus done was
really for the advantage of all persons interested, including
the underwriters.  As we have already seen, the wheat was
all more or less damaged.  Now, it appears that the condition
of affairs in Portugal with respect to the importation of wheat
is peculiar, and that damaged grain is unsalable there.  The
finding of the commissioner is, that the Liscard's wheat would
have been almost valueless at Lisbon.  The evidence certainly
warrants the conclusion that the loss to the appellant would
have been greater had the cargo gone on to Lisbon.  We agree
with the commissioner and the court below in the view that
the adventure was practically frustrated, and hence justifiably
abandoned; and that, under the special circumstances, the
sale of the wheat at Boston may fairly be considered to have
been made from necessity for the benefit of all concerned.
Mr. Parsons (2 Marine Insurance, 411) says that if a ship at
an intermediate port finds a part of its cargo so injured by
sea damage that it is unfit to be carried on, it may be sold at
that port, and the loss adjusted as a salvage loss.  Mr. Phillips
(2 Insurance, sec. 1480) says, speaking of an adjustment as
upon a salvage loss: 'The underwriter is liable for such an
adjustment of a particular average only in cases where the
sale at an intermediate port is obviously expedient, and made
on account of damage by the perils insured against; where,
if the subject were forwarded to the port of destination, it
would be greatly diminished in value or be of no value, on
arriving there.'  We think that the present case falls within
the rule even as thus laid down, and that the appellant is justly
chargeable with the difference between the valuation in the

policy and the sum realized by the sale, and that the adjustment upon that basis was correct."

We agree with the views thus expressed and hold that the method of adjustment pursued by the commissioner, and affirmed by both courts below, was, under the special circumstances of this case, a proper and correct one.

We have examined the other objections taken to the commissioner's report and are of opinion that they are not well founded. The decree must be

*Affirmed.*