### LEHIGH & WILKES–BARRE COAL CO. v. GLOBE & RUTGERS FIRE INS. CO.

(Circuit Court of Appeals, Second Circuit. March 16, 1925.)

No. 125.

**1. Insurance ☞412 — No "stranding," where no stoppage of vessel's progress occurred.**

Damages to ships in towage, from being dragged alongside of riprap or artificial sides of canal, were not caused by "stranding," within tower's liability insurance policy, where there was no stoppage of ship, implied by term "stranding."

[Ed. Note.—For other definitions, see Words and Phrases, Stranded—Stranding.]

**2. Insurance ☞411—Damages to ships from striking rock abutments from bank of canal while being towed held not from "collision."**

Damages to ships from striking rock abutments or projections from bank of canal while being towed *held* not damages from "collision," within tower's liability insurance policy; "collision," as used in maritime law, referring to contact of boat involved with another boat, or, while being navigated, with a floating object.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Collision.]

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Lehigh & Wilkes-Barre Coal Company against the Globe & Rutgers Fire Insurance Company. Judgment for respondent, and libelant appeals. Affirmed.

The libelant is a corporation organized under the laws of the state of Pennsylvania, but maintaining an office for the transaction of business in the city of New York, and within the Southern district of New York. The respondent is a corporation organized under the laws of the state of New York, and it maintains an office in the city of New

York, and within the Southern district of New York.

The libel was filed to recover damages sustained by barges in tow of libelant's tugs, and which it asserts were covered by certain policies of insurance issued by respondent. The suit is brought upon two policies of marine insurance issued to the libelant on tower's liability. The first policy was dated on February 1, 1918, and was in the sum of $30,000, being $10,000 on each of the following described vessels: Tug Honeybrook, tug Plymouth, and tug Nottingham. The second policy was dated on December 17, 1918, and was in the sum of $150,000, being $50,000 on each of the tugs above named.

The libel sets forth six causes of action. The second, third, fourth, and sixth causes of action were based on the first marine policy of insurance, and the fifth cause of action was based on the second policy. The first cause of action was, with the court's permission, withdrawn at the trial.

The second cause of action was for an injury to the libelant's barge No. 14 while being towed through the Cape Cod Canal on August 8, 1918, by the tug Plymouth. The third cause of action was for an injury to libelant's barge No. 6 while being towed through the said canal on October 2, 1918, by the tug Honeybrook. The fourth cause of action was for an injury to libelant's barge No. 5 while being towed through the said canal on October 5, 1918, by the tug Plymouth. The fifth cause of action was for an injury to libelant's barge Wilkesbarre while being towed through Hell Gate, and rounding Hallett's Point on February 9, 1919, by the tug Nottingham. The sixth cause of action was for an injury to the barge Sidney, belonging to the New York, Ontario & Western Railroad, while being towed through the canal on September 6, 1918, by the tug Honeybrook.

The sixth cause of action was added to the libel by an order amending the libel, made by the court on September 24, 1923. In all but the sixth cause of action the barges, which were injured, belonged to the libelant, and they received their injuries while being towed by the libelant's own tugs. In the sixth cause of action the libelant had paid, pursuant to a court decree, to the owner of the barges, the amount of the damage suffered by reason of the "collision and stranding" which is complained of herein.

The case went to trial, and at its close the court dismissed the libel, on the ground that the libelant could not recover under the tower's liability clause upon which the libel was

6 F.(2d)—47

based, as the injuries suffered did not occur in a "collision," within the meaning of the policies.

Oudin, Kilbreth & Schackno, of New York City (James T. Kilbreth and Irving Miller, both of New York City, of counsel), for appellant.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought to recover upon two marine certificates of insurance issued by defendant to libelant. The respondent therein agreed to pay to the assured, the libelant, if it became liable to pay and did pay, by way of damages, if the vessel insured or her tow came into "collision." The aggregate amount of the damages demanded is $49,389.79. The court below dismissed the libel after hearing the testimony taken in open court and considering the depositions taken out of court. The respondent offered no testimony, although it cross-examined the witnesses of the libelant.

All the causes of action, except the fifth, related to injuries which occurred in the Cape Cod Canal. They are the second, third, fourth, and sixth causes of action. In the second, third, fourth, and fifth causes of action the barges injured belonged to the libelant, and were being towed by a tug which also belonged to the libelant, but by express provision in the policy sued upon in the above causes of action this fact was immaterial, as the policy expressly stated that it was understood and agreed that some of the vessels were the property of the libelant and that all losses were to be settled "on the same basis as if there was separate ownership."

The policies insured the tugs named therein, and which are the tugs herein involved. The first of these policies provided that:

" * * * It is further agreed that, if the vessel hereby insured or her tow shall come into collision with any other vessel, craft, or structure, floating or otherwise, or shall strand such other vessel or craft, and the assured, as owner of the vessel, shall in consequence thereof become liable to pay and shall pay by way of damages to any other person or persons any sum or sums, not exceeding in respect to any one such casualty the value of the vessel hereby insured, we, the assurers, will pay the assured such proportion of such sum or sums so paid as our subscriptions

hereto bear to the value of the vessel hereby insured."

It further provided:

" * * * That this policy shall also extend to and cover the said vessel's [the tug's] legal liability for any collision and/or stranding which may occur to any vessel or vessels or craft while in tow of said vessel, subject to all the terms and conditions of this clause."

The first of the above provisions insures the libelant in case it is obliged to pay to any other person damages for injuries done by the tug or her tow to the owner of some other "vessel, craft, or structure,' and no such damages have been paid by the libelant or are involved in the allegations contained in the causes of action brought upon this policy. It will be observed, however, that under the first of these provisions "collision," while not defined, is explained as "collision with any other vessel, craft, or structure, floating or otherwise."

The fifth cause of action originally was based on a marine policy of insurance, described as No. 1N–2927 effective from noon of December 31, 1918, until noon of December 31, 1919. It insured the same tugs as were insured in the first policy, each being insured in the sum of $50,000. It provided that "this insurance covers all marine casualties," including damage by ice, but excluding fire. It also included damage to other vessels for which the assured might be legally liable. But an order of the court was made on January 24, 1922, which amended the libel by striking therefrom the allegation as to policy 1N–2927, and substituting .in place thereof policy No. 1N–2957, effective for one year from January 30, 1919, which was issued by the respondent and insured the libelant's three tugs named in the first policy heretofore mentioned and for the same amount, $10,000, on each of the tugs. This policy also contained the following provision:

" * * * And it is further agreed that this policy shall also extend to and cover the said vessel's legal liability for any collision and/or stranding which may occur to any vessel or vessels or craft while in tow of said vessel, subject to all the terms and conditions of this clause."

The above clause is identical with that contained in the first policy. While the libel asserts five distinct causes of action, they are based on policies of insurance which are identical so far as the clause is concerned upon which the libelant bases his right of recovery.

The evidence disclosed that the country through which the canal runs is sandy, and that the canal had artificial sides constructed with stones and rocks, known as riprap. In taking the tow through the canal, the tug, as was the usual practice, was in charge of a pilot, under government regulations, who took the wheel and steered the tow. At the time these injuries occurred the United States was at war, and the canal was under government control, and government pilots took charge of vessels going through the canal. The Cape Cod Canal is a narrow body of water, and does not run in a straight line, but has bends and curves in it. When a tug and tow go around these bends, the barges necessarily swing more or less. The canal is so narrow that boats never pass each other; it being described as a "one-way street." The boats had been taken over by the Shipping Board and were being operated by the United States government. The tows were made up under the direction of government officials. When the tows herein involved got pretty well through the canal, they were obliged to make a turn, and in doing so they swung over and caught on the side of the bank, and dragged alongside of the riprap. The tow did not stop, but continued right on. In the fifth cause of action the evidence indicates that the tow hit the steep rocks along the shore.

[1] All questions of stranding were properly disregarded by the court below, inasmuch as the term "stranding" implies a stoppage of the vessel's progress and a resting for a longer or shorter period. London Assurance Co. v. Companhia De Moagens, 167 U. S. 149, 17 S. Ct. 785, 42 L. Ed. 113; Parsons on Marine Insurance, 632. And there was no such stoppage shown in any of the causes of action under consideration.

[2] The collision clause raises a more serious question. It covers any damage by "collision" to the vessels while in tow. The libelant's right to recover under this clause depends upon whether it amounted to a "collision," within the meaning of the policy, that the barges, while being towed, sheered over and struck the bank of the canal, or the rock abutments or projections thereof, and, in one of the causes of action, the shore or steep rocks along the shore.

If the term "collision," when used in maritime law and in a marine policy of insurance, has an established meaning, a departure from that meaning would work injustice, and should be avoided. The importance of uniformity in the maritime law on this subject cannot be doubted. It is certainly im-

portant that on such a subject as this the courts of this country should be in agreement, and it is also desirable, if possible, that the courts of England and of the United States in like manner should be in accord. The Liscard (D. C.) 56 F. 44, 46. As was said in Thames & Mersey Ins. Co. v. Hamilton, Fraser Co., L. R. 12 A. C. 484 (1887), by Lord Herschell in the House of Lords:

"I think it will be found, upon examination of the authorities, that the general words in a marine policy have received from the courts, for a long series of years, a construction to which your Lordships would do well to adhere. The instrument is one in daily use, and, if your Lordships were to put a new construction upon it, you would be likely to defeat, and not to give effect to, the intention of the parties. Nothing would be more dangerous, in my opinion, than to depart from a construction which the authorities have put upon words in common use in a mercantile instrument, even if the propriety of the decision might originally have been open to question."

And in the same case Lord Macnaghten said:

"I see no reason for departing from this settled rule. In marine insurance it is above all things necessary to abide by settled rules and to avoid anything like novel refinements or a new departure."

This court recently, in The Turret Crown, 297 F. 766, 776, 777, in considering the maritime law respecting deviation, commented upon the desirability that the law of the United States and that of England should be in conformity upon matters of commercial law, in the absence of some rule of public policy which would forbid. And see a similar opinion this court expressed in The William J. Quillan, 180 F. 681, 103 C. C. A. 647.

In ordinary language a "collision" means a striking together of two bodies. The Century Dictionary defines the term as "the meeting and mutual striking or clashing of two or more moving bodies, or of a moving body with a stationary one." The striking of the barges against the riprap of the canal, or the "rock abutments or projections thereof," no doubt was a collision within the terms of the above definition. But it is another matter whether or not it constitutes a collision within the meaning of a maritime policy of insurance. Words or terms which have acquired a technical signification in the law are interpreted according to such meaning. It is true ordinarily that the language of a contract is to be construed according to the primary and natural meaning of the language which the parties have chosen to use. But it seems to be an exception to that rule, where the ordinary meaning of a word is not the same with its legal sense. In such cases the parties are presumed, as was said by Lord Watson, in the House of Lords, in The Niobe (1891) L. R. 16 A. C. 401, to know the law and to have contracted on the faith of it.

In Bouvier's Law Dictionary the word "collision" is defined in maritime law as "the act of ships or vessels striking together, or of one vessel running against or afoul of another."

In Benedict's Admiralty (4th Ed.) § 243, it is said: "The word 'collision,' in its ordinary admiralty significance, means the striking together of two vessels." He adds that the word is used in a looser sense of the striking together of a vessel and some other object, and that "the admiralty will in some cases take jurisdiction of such accidents." No attempt is made by the author to explain when he thinks that admiralty will take jurisdiction of such cases.

In 11 C. J. 1011, it is said that, "in its strict nautical and legal acceptation, the term 'collision' means the impinging of vessels together while being navigated; two navigable things coming into contact; the act of ships or vessels striking together; the striking or running afoul of one ship by another."

In Arnould's Marine Insurance (10th Ed.) vol. 2, § 793, the rule is stated as follows:

"It will be noticed that, in order to bring the collision clause into operation, there must be a collision between the ship insured and some other ship and vessel, and that the only damages insured against are (in the ordinary forms of the clause) sums payable to the owners of the latter vessel in consequence thereof. The shipowner is therefore not protected against liability due to his vessel running into a dockwall, breakwater, pontoon, or anything that is not another ship. * * *"

The same writer, in section 826, in discussing "Perils of the Sea," after saying that loss by collision is, generally speaking, a loss by the perils of the sea, and stating that it is not uncommon at the present day to find the loss by collision expressly insured against, adds the following:

"Sometimes the insurance is against 'collision' merely, which term probably implies the coming into contact of two things, both of which are navigable. Sometimes, however, the clause is wider, so as to include the risk of striking against, not merely floating

or navigable objects, but also structures such as harbors, wharves, piers, and the like, or obstructions, such as ice or wreck."

Spencer on Marine Collisions, in section 10, defines collision, saying that in the strict nautical and legal acceptation of the term it means the "impinging of vessels together." He adds that: "Common usage, however, has extended the application of the term, so as to include the impact of a vessel with other floating objects. The term in its strict legal sense does not include the contact of vessels with rocks, sunken obstructions, or other fixed structure; losses arising from such mishaps are more properly embraced within the meaning of the term stranding."

In Chandler v. Blogg (1898) L. R. 1 Q. B. 32, the court stated its agreement with the contention of counsel "that 'collision,' when used alone, without other words means two navigable things coming into contact." And in Everard v. Kendall (1869–70) L. R. 5 C. C. P. 428, Montague Smith, J., declared that "in common understanding, and as understood in the Court of Admiralty, damage by collision is damage sustained by a ship from another ship coming in contact with it." In Richardson v. Burrows, a case decided in 1880 and not reported, but cited in Lowndes on Marine Insurance, § 196, and in Spencer on Collisions, 14, Lord Coleridge ruled that the word "collision" meant collision with another ship, and did not mean either a rock, or a sand bank, or floating wreck.

In 1896 the Supreme Court, in London Assurance Co. v. Companhia De Moagens, supra, had before it the meaning of the word "collision" as used in a policy of marine insurance. In that case a vessel at her dock in New York had cast off her lines and was about to proceed on her voyage, but was delayed in actually proceeding by some derangement to her machinery. While so delayed she was run into by a lighter being towed out of the dock, and injured. The question was whether this was a "collision" within the meaning of the marine certificate of insurance. The court said:

"* * * We think that the vessel was 'in collision,' within the meaning of the language used in the certificate, which represented and took the place of the policy. It was not necessary that the vessel should itself be in motion at the time of collision. If, while anchored in the harbor, a vessel is run into by another vessel, it would certainly be said that the two vessels had been in collision, although one was at anchor and the other was in motion. We seen no distinction, so far as this question is concerned, between a vessel at anchor and one at the wharf fully loaded and in entire readiness to proceed upon her voyage, with steam up and simply awaiting the regulation of some insignificant matter about the machinery before moving out. If, while so stationary (at anchor or at wharf), the vessel is run into by another, we should certainly, in the ordinary use of language, say that she had been in collision."

The court then went on to say:

"It is impossible, as we think, to give a certain and definite meaning to the words 'in collision,' or to so limit their meaning as to plainly describe in advance that which shall and that which shall not amount to a collision, within the meaning of this policy."

In Burnham v. China Mut. Ins. Co., 189 Mass. 100, 75 N. E. 74, 109 Am. St. Rep. 627, the court said:

"Some of the policies in these cases cover 'the risk of collision sustained,' and others are against 'loss sustained by collision with another vessel.' We are of opinion that the two forms mean the same thing, namely, collision with another vessel."

In the cases before the Massachusetts court the plaintiff's vessel had struck a wreck, sunk several hours before, and which was never raised, and the court in a unanimous opinion held that the vessel had not come into collision with another vessel, within the meaning of the policies. In its opinion the court quoted the ruling of Lord Coleridge in Richardson v. Burrows, supra, saying that, while it was a nisi prius decision, "it is of some weight."

In Cline v. Western Assur. Co., 101 Va. 496, 44 S. E. 700, the action was upon a marine policy insuring a ship against loss caused, among other things, by "collision." It was charged that the ship had collided with some sunken or floating obstruction in a river. It was held that striking a "sunken or floating obstruction" was not a "collision," within the meaning of the policy. The authorities were quite fully reviewed.

Some of the courts of the state of New York have given to the term "collision" a somewhat broader significance than the courts of England or of the United States. In a recent case, Steam Tug John O. Carroll v. Ætna Ins. Co., 203 App. Div. 430, 196 N. Y. S. 698, the court had before it the question whether accidental contact between a vessel and a floating, but nonnavigable, object constituted a "collision," within the meaning of that word as used in a policy of marine insurance. The court decided that it did, and said that there was no hardship in giving to the word "its ordinary and gen-

erally accepted meaning." The court in its opinion did not review the English decisions, nor refer to any except two New York cases and the decision in the Southern district of New York, in which Judge Hough (then a District Judge) said: "Neither is it denied that the word 'collision,' as used in marine insurance, can no longer be limited to that fortuitously injurious contact of navigating vessels which is its obvious and natural signification." Western Transit Co. v. Brown, 152 F. 476.

The suit in that case was brought on a running down clause in a marine policy, which was intended to protect the owner against loss because of his liability for damage caused by his own ship to another ship. That is quite a different matter from the insurance of a ship from collision. In the latter case the owner is insured against loss arising from damage to his own ship caused by a collision. The collision in the case arose between a tug and a schooner in tow while navigating, which was met by a steamer which suddenly sheered to port, causing the Martha to sink. Under the circumstances of the case the lower court held there was no right of recovery under the policy. On appeal to this court we affirmed the decision below, which denied any right of recovery, as the vessel assured had not herself come in contact with the vessel which sank. 161 F. 869, 88 C. C. A. 617. We fail to see that that decision, either in the court below or in this court, departed from the established decisions of the maritime law. And we do not find in the Carroll Case that that decision particularly helps the contention of the appellant herein, inasmuch as the "collision" there was between a vessel and a floating, although a nonnavigable, object. In the instant case the so-called collision was not with a floating object.

In 1897, in Newtown Creek Towing Co. v. Ætna Ins. Co., 23 App. Div. 152, 48 N. Y. S. 927, the New York Appellate Division of the Second Department held that the word "collision" in a policy of insurance covered an injury to a boat, which, while it was being towed, came in contact with a floating cake of ice. Judge Cullen (afterwards Chief Judge of the Court of Appeals) and Judge Willard Bartlett dissented. The court, in the majority opinion, said:

"The contract is, on its face, designated as insurance of 'tower's liability.' In its common acceptation the word 'collision' imports the act of colliding; a striking together; violent contact. It is, however, in the admiralty sense that it is to be considered here, and

it has been seen that in such sense, for the purposes of relief by libelants, it is not confined to vessels coming in contact with vessels, but includes that of vessels coming in collision with any moving or stationary objects, such, for instance, as collision with a pile, driven piles, sunken hull of a vessel, drawbridge, a dredge at anchor, floating derrick, and other objects on or beneath the surface of the water. When we get away from the strict nautical and legal definition of the term 'collision,' where is the limit of the application of it within the cases which, as collisions in the broader sense, are the subject of admiralty jurisdiction, and in which claims are supported by adjudicated liability in that jurisdiction?"

The New York Court of Appeals (163 N. Y. 114, 57 N. E. 302) reversed the case in an opinion written by Chief Judge Parker. The reversal was based upon the fact that the policy of insurance was against "any accident" caused by collision, and the Court of Appeals did not think that injury could properly be regarded as "accidental" within the meaning of the policy. It thought that the right to recover was restricted to a collision by mere chance or accident, and did not extend to a case where there had been a deliberate attempt to force the boat through a floe or field of ice. The authorities are not reviewed, but the court, in its opinion, said:

"Collision, in its strict nautical and legal acceptation, originally meant the impinging upon one another of vessels while being navigated, but in course of time and by common usage the application of the term has been so far extended, in this country, at least, as to include the impact of a vessel with other floating objects. * * * However, whether the term be treated by the courts as so fixed in character as to be restricted in its meaning to the coming together of two vessels, as is the rule in France, or so flexible as to include a variety of floating objects other than vessels, the idea of accident, so far as the insured is concerned, underlies it."

But, when these New York cases are carefully considered, it will be seen that no one of them affords support for what is contended for in the case which is now before the court. We think that no error was committed by the court below in dismissing the libel. The risk covered by the policies was that of "collision," and we are satisfied that, under the circumstances disclosed respecting the injuries which happened to the barges, no collision occurred within the meaning of the maritime law. In none of the causes of ac-

tion involved did the boat insured come in contact with another boat, or, while being navigated, with a floating object.

Decree affirmed.