INDEMNITY MUT. MARINE ASSUR. CO., LIMITED, OF LONDON, v. UNITED OIL CO.

(District Court, S. D. New York. July 6, 1898.)

MARINE INSURANCE — MEMORANDUM CLAUSE — "EXTRAORDINARY LEAKAGE" — PAROL EVIDENCE.

    A marine policy by a memorandum clause for an extra premium agreed to cover "extraordinary leakage, loss to be paid by the company if amounting to 3 per cent. of the amount insured." The application was through a broker, for a broad policy to cover all risks "without qualification as to how the leak was caused." The insurer knew this and agreed to issue a policy in the form asked for; and subsequently issued the memorandum clause as above stated. *Held*, that the language used nat-

urally imported and was designed to express insurance for all loss by leakage, howsoever caused, and could not be varied by parol evidence of an "understanding" with the broker, not made known to the assured, that "no claim would be made for leakage unless caused by sea perils."

This was a libel by the Indemnity Mutual Marine Assurance Company, Limited, of London, against the United Oil Company.

Cox & Tappan, for libelant.

Conway & Westbrook, for respondent.

BROWN, District Judge. The above libel was filed to recover insurance premiums. The debt was admitted and a tender made of the amount due less an offset of $101.98, which the answer alleges to be due to the defendants from the libelant for leakage from barrels of oil on the steamers Scindia and Clive within the terms of the libelant's policy. There was no distinct proof that the leakage of the oil arose from sea perils, although the natural inference from the proof that the barrels were delivered in New York in apparently good condition, would be that the loss arose from sea perils, no other cause of loss appearing. The main question litigated, however, is whether the memorandum clause is to be limited to leakage occasioned by sea perils, or whether it extends to leakage generally, without reference to its cause.

The printed form in the body of the policy provides:

"Not liable for leakage from molasses or other liquids, unless occasioned by stranding or collision with another vessel."

The memorandum clause was as follows:

"It is also understood and agreed that for and in consideration of an agreed additional premium this insurance is to cover leakage of the following named oils * * * it being understood and agreed that one-half of one per cent. of the quantity laden shall be first deducted as ordinary leakage, the excess of such one-half of one per cent. to be considered as extraordinary leakage, loss to be paid by this company if amounting to three per cent. on the amount insured."

The leakage of oil on each vessel in this case exceeded 3 per cent. The libelant declined to allow the loss except upon specific proof that it was occasioned through sea perils, and it is contended that this condition is to be read into the memorandum clause by implication.

It is well settled in marine policies that general words such as "all other losses" following the specific enumeration of various sea peril causes, are to be construed ejusdem generis with the particular causes previously specified, as being presumptively the intention of the parties; but it would be a perversion of this rule and wholly outside of the reasons for it, to apply it to a single specific cause of loss, viz. leakage, specially provided for by a memorandum clause and an extra compensation, where the natural import of the language suggests no such limitation to sea perils, but the contrary. The body of the policy includes two of the chief sources of loss by sea perils, namely, collision and stranding. It does not cover leakage caused by rolling and pitching, a sea peril,—nor leakage through insufficiency of packages or through careless handling, which are not sea perils. It is often impossible for the insured to ascertain which is the true

cause of the loss; so that if a policy on leakage is restricted to sea-peril causes, he will often lose all benefit from his policy because the true cause of loss cannot be ascertained. The only satisfactory insurance against leakage, therefore, is a general insurance without reference to its cause. This was what was desired and what the memorandum clause by its very language, as it seems to me, plainly purports to insure. The distinction it draws is between ordinary leakage and extraordinary leakage; not between sea perils and non sea perils. It declares that a loss of one-half of 1 per. cent. shall be deemed "ordinary leakage," and a loss in excess of that to be "extraordinary leakage," which is "to be paid by the company if amounting to three per cent. on the amount insured." In my judgment this is a clear and positive engagement to pay any such extraordinary loss above 3 per cent., and cannot be varied by parol evidence of any understanding between the parties to the contrary.

The evidence leaves no doubt that both parties understood this to be the meaning of the language used in the memorandum clause. The policy was negotiated by Mr. Hunter, a broker, who was paid a commission by the insurers, and by Mr. Appleton, the representative of the insurers. Mr. Hunter sought the defendants and induced them to take out this policy. He was told that defendants "wanted absolute insurance * * * to be covered for all risks." From Mr. Appleton's testimony it is plain that this was communicated to the libelant. Mr. Appleton in testifying to his conversation with Mr. Hunter before the policy was issued says:

"My recollection is that it bore upon the question of leakage in connection with the oil to be insured; the purport of it was that they wanted a very broad policy and did not want any particular qualifications to be put in as to how that leakage was to be caused. I told Mr. Hunter the policy would be given in the form he asked."

It is clear, therefore, that Mr. Appleton understood that the language of the memorandum clause meant no qualification as to how leakage was caused. Mr. Appleton adds, however, that this was "with the distinct understanding that no claim would be made for leakage unless caused by sea perils, and he (Hunter) said that would be satisfactory." This "understanding" with Mr. Hunter was a limitation directly contrary to what Mr. Appleton knew the insured wanted and authorized Mr. Hunter to obtain; and contrary also to the language of the policy which he promised to issue and did issue. Mr. Hunter had no authority to assent to any such understanding. No notice of it was given to the defendants. The policy was issued to them, the company took the premium, and Mr. Hunter took his commissions, and when the loss happened within the terms of the policy, the insurers set up an unauthorized and a virtually secret "understanding" with the broker contrary to the language of the memorandum. If it is strange that such a defense should be interposed, it would be stranger still if the law could sustain it.

Decree for the defendant with costs.