DE FARCONNET et al. v. WESTERN INS. CO.

(District Court, S. D. New York. August 3, 1901.)

1. JUDGMENT—CONCLUSIVENESS.

Libelants shipped petroleum, covered by marine insurance, on board a bark which became disabled at sea. Salvage and other expenses were incurred, to pay which the ship and cargo were subsequently sold by the master. *Held*, in an action on the policy, that a judgment in an action on the master's bottomry draft, pledging ship and freight, in which the sale of the ship was held invalid, was not admissible in evidence, nor binding in any way, it being between different parties, and on different evidence.

**2. MARINE INSURANCE—LIMITATIONS OF ACTIONS—WAIVER.**

Any conduct of an insurer which tends to mislead the insured, and cause delay in prosecuting his claim beyond the time limited in the policy, amounts to a waiver of the condition.

**3. SAME.**

Subsequent dealings with the insured, in which the insurer recognizes the continued validity of the policy, and requires further action on the part of the insured, involving labor and expense, amount to a waiver of the condition in the policy limiting the time for prosecuting claims.

**4. SAME—FORMAL ABANDONMENT—WAIVER.**

Where the insured under a marine policy wrote the insurer, inquiring "whether we must make an abandonment by judicial act, or if our present letter, expressing an intent to abandon, will do?" the latter's answer, ignoring the informal tender, and denying any liability under the policy, excuses a delay in making the formal tender.

**5. SAME—RISKS COVERED—GENERAL AVERAGE.**

Libelants shipped petroleum, covered by marine insurance against sea perils, on board a bark which became disabled at sea. *Held*, that the general average charges assessable on the oil, and for which the insurer was liable under the policy, included the decree for salvage, with costs and expenses, inward pilotage, towage, ship's new material used up in the salvage work, etc.

**6. SAME—PETROLEUM AVERAGE.**

A certificate for marine insurance contained an exception of "particular average unless vessel be stranded," etc. The policy provided that the insurer should not be liable for leakage of liquids, unless occasioned by stranding. The vessel containing the petroleum became disabled at sea, and in being towed to the nearest harbor became stranded, and pounded for half an hour on a coral reef, causing excessive damage to the bottom. Its cargo on the first warehousing, pending the repairing of the vessel, appeared to be in good condition, and experienced witnesses testified that the damage was caused by contact with sea water, detention in a tropical climate, and frequent handling. *Held*, that the loss by leakage was caused by stranding, within the policy.

In Admiralty.

Butler, Notman, Joline & Mynderse, for libelants.

Wing, Putnam & Burlingham, for respondent.

BROWN, District Judge. The libel in this case was filed on January 14, 1893, claiming a total loss, upon an abandonment, under a certificate of marine insurance issued by the respondent's agents at Baltimore, Md., on February 8, 1890, for $5,600 upon 5,000 cases of refined petroleum, valued at that sum and shipped by libelants' agents on board the Italian bark Sempre Avanti, at and from New York to Marseilles. The libel alleges that the loss was by sea perils; that the ship became disabled at sea and was towed into St. Georges, Bermuda, in distress, whereby large salvage expenses were incurred, and port expenses in the repair of the bark for the purpose of prosecuting the voyage; that all efforts to obtain funds to pay the salvage charges and other expenses were unsuccessful and that ship and cargo were thereupon sold by the master, as authorized by the Italian consul, and the proceeds applied in payment of said charges, less £89–15–5 remitted to the owners of the ship; that the cargo became a total loss, and that the libelants had made due abandonment to the insurers. An amendment alleged the stranding of the bark for about half an hour, through sea perils, in entering St. Georges, and

particular average damage to the cases of oil varying from about 25 to 40 per cent. of its value, through the severe weather, stranding, the leaking of the vessel, and through handling, discharge and storage at Bermuda.

The answer, beside general denials, alleged that the loss was not covered by the policy; that no decree for salvage had been made; that none of the Bermuda expenses were general average; that the abandonment was insufficient; and that the suit was barred by the failure of the libelants to prosecute, as required by the policy, within one year after the loss.

The evidence sustains all the most material averments of the libel. The bark was of about 400 tons, staunch and seaworthy. She sailed from New York on March 5, 1890. When three days out she met severe weather, which continued until March 10th, when her rudder was broken by heavy seas and the bark became unmanageable. On the 12th she began to leak, through the pounding of broken pieces of the rudder which were then thrown overboard. A temporary spar-rudder was then rigged up, which gave poor service until the 17th, when it became necessary to cut it adrift. On the 22d the steamer Cathay, in response to the bark's signals of distress, took her in tow, and with considerable difficulty brought her on March 24th within three miles of St. Georges, whence she was taken by two tugs into the harbor. While crossing the bar, however, she grounded upon a coral reef, apparently without negligence in the tugs, but in consequence of her unmanageable condition. She lay there pounding for about half an hour in a strong wind and high sea before she could be hauled off. The stranding caused much additional damage, and increased leaking to the extent of six inches per hour until checked by divers. On surveys the keel was found much chafed, the scarph open a half inch, the keel splintered under the mainmast, and started at the stern post about three-fourths of an inch and the copper off on both sides, requiring about 600 sheets to be replaced.

The value of the bark in her existing condition on arrival at St. Georges was appraised at £300. The estimated cost of repair including dockage and replacing ship's new material used up in salvage amounting to £165–16–7, was £1,223–11–5. For the purpose of continuing the voyage, the vessel three days afterwards was docked, and the repairs expeditiously made, at an expense, according to the vouchers returned, of about £1,280 for actual repairs, including docking, though there were other incidental charges. The most important items of repair were for calking and for remetaling. Meantime on March 24th, the very day of arrival, a libel for salvage in behalf of the Cathay was filed in the vice admiralty court against the bark, her cargo and freight, which on the 28th were released on bond for £3,000. After a trial, a decree was entered on May 26, 1890, for £2,027, salvage, with £67–14–9 costs, to which are to be added charges for sureties and counsel, making a total aggregate for salvage expenses of £2,337.

The award of salvage for two days' service seems excessive, being about 42 per cent. of the total value of ship and cargo; and this large award was no doubt one of the causes of the subsequent inability to obtain bottomry, resulting in the breaking up of the voyage.

The repairs were completed by the 26th of May, on which day the master obtained the consul's permission to reload the cargo for the purpose of continuing the voyage. The reloading was completed by June 4th. The master in the meantime had been endeavoring to obtain the funds necessary to pay the charges for salvage, repairs and other Bermuda expenses, first from the ship owners and then by bottomry. For the latter purpose he came twice with the consul's permission to New York, where he employed competent counsel and Mr. Seagur, a shipping expert, to assist in obtaining the money. Correspondence and communication were had with the national board of marine underwriters, of which the respondent was a member, and both had full notice at the time of all the master's proceedings in this regard, as well as of the subsequent sale of ship and cargo. An application to them for the loan was entertained, but on consideration declined. Due advertisement was made for the bottomry loan both in Bermuda and New York, and when all these efforts were found to be unavailing, the master by his counsel sent a circular letter to the marine board and to all the underwriters, agents and shippers, informing them of the fact, and that the master would return to Bermuda and sell so much of the cargo as might be necessary for the purpose of raising funds. The master returned to Bermuda on June 19th. He was accompanied on the same steamer by Capt. Cann, a surveyor in the employ of the marine board, who was appointed by the respondent to examine into the circumstances at Bermuda and report, and he was apparently authorized by the respondent to buy in the oil at certain figures given him by the respondent, as recommended by the marine board.

On June 23, 1900, the master applied to the consul for leave to sell vessel and cargo, so far as necessary to pay the charges and expenses, reciting the facts, and in concluding the application he says:

"I hereby give notice to this consulate of my abandonment of said cargo and vessel aforesaid."

On June 24th, the consul's leave to sell was granted and the sale was advertised for July 8th. On June 26th Captain Cann left Bermuda, and on the 30th of June, after arrival in New York, reported that the oil was to be sold on July 8th; that it was likely to bring three shillings a case, a fair price, and that the "figures given him" would not probably buy it. On July 8th, the sale was made; the oil brought an average of about three shillings per case, amounting in all to £732–5–0 gross; or £676–16–8 net. The rest of the cargo brought £4,117–3–6 gross. The vessel brought £1,100–0–0 gross, or net £1,017–10–0. The net receipts from the entire cargo were £4,541–3–5. Total net receipts £5,558–13–5. This was £89–8–9 only in excess of the salvage and Bermuda expenses, and this excess was remitted by the master to the owners at Naples "to be paid to the interested parties."

On July 21, 1890, the libelants informed the respondent's agents of the loss, of the failure of the master's attempts to obtain bottomry, of the sale, and of their desire to abandon. The respondent answered denying any liability, and on November 6, 1890, the libelants made a formal abandonment to the respondent and to the other insurers of particular average losses.

The result, ruinous as it was, was apparently foreseen by the marine board, and its advice to the respondent, one of its members, to buy in the oil, was seemingly given in expectation of some such outcome.

The charges against the ship and owners for general average, approximately reckoned according to the local English rule, and for repairs, docking, commissions, wharfage, wages, provisions and other ship's expenses and port charges not included in general average under the English rule, were apparently not less than £1,900, or about $4,300 more than was realized from the sale of the vessel after she was repaired. To this extent at least the cargo was applied directly to pay the debts of the ship and owners, for which the latter would remain answerable to the cargo owners and their insurers.

The respondent argues that the proceedings for the sale of the ship and cargo were collusive and fraudulent. But no such charge is made in the answer. The answer alleges, however, that the sale of the cargo was unauthorized and void, and refers to a subsequent adjudication in Bermuda in an action on the master's bottomry draft pledging ship and freight, in which the sale of the ship was held invalid, as appears by the exhibits here offered, on the ground partly of insufficient proof of proper communication with the owner of the bark. The proceedings in that cause, however, being between different parties and on different evidence, are not admissible as evidence in this case, nor is the judgment in any way binding here; it is the same also as respects the suit on the other policies in the French court.

But the question whether the sale of the ship was collusive and fraudulent, or the sale of the entire cargo unauthorized, or the disposition of the proceeds, lawful or not, is not material in this action between the assured and their insurers. If the master's sale of the ship was fraudulent it was barratry, which, so far as that affected the cargo, was expressly covered by this policy. As respects the sale of the oil, there can be no question on the evidence, as it seems to me, that diligent efforts were made to obtain funds on bottomry and respondentia without success; and that after those efforts, and after the respondent also, on information of the facts, had declined to make the loan, the sale of the oil at Bermuda was for the best interest of all concerned; that the respondent, after the examination and report by its agent, acquiesced in the proposed sale, and that the sale itself was at fair and satisfactory prices, considering that the cases in which the oil was contained had become liable to immediate leakage (with some leakage already suffered and 20 cases empty) from the tropical climate, from repeated handling, and some rust through contact with sea water arising from sea perils.

1. Time limit. Upon the above facts the libelants are entitled to at least some recovery, unless their rights have been lost through failure to "prosecute within a year after the loss."

The policy provides that "all claims under it shall be void unless prosecuted within one year from the date of the loss."

If the word "prosecute" be here construed in its literal, primary or general sense of following up, pursuing (Webst. Dict.) i. e. endeav-

oring to collect the claim, that has certainly been done from the very first, and with reasonable diligence, considering the difficulties of the case; and if construed in the technical, legal sense of prosecuting by suit against the respondent (Carraway v. Insurance Co., 26 La. Ann. 298; Allen v. Insurance Co., 15 Can. Sup. Ct. 488, 493), still the defense is, I think, not available here, since in several ways the evidence seems to show clearly a waiver by the respondent of this condition.

Any conduct of the insurers which tends to mislead the assured and cause delay beyond the time limited, is always to be construed as a waiver of that condition. The requirements of good faith estop the insurer from taking advantage of delay thus induced. The same construction is also given to subsequent conduct and dealings with the assured in which the insurer recognizes the continued validity of the policy, and requires of the assured further action involving him in trouble and expense. Thompson v. Insurance Co., 136 U. S. 299, 10 Sup. Ct. 1019, 34 L. Ed. 408; Titus v. Insurance Co., 81 N. Y. 410; Roby v. Insurance Co., 120 N. Y. 510, 24 N. E. 808; Weed v. Insurance Co., 133 N. Y. 394, 407, 408, 31 N. E. 231; Brink v. Insurance Co., 80 N. Y. 108, 112. On both grounds this defense should here be overruled.

Again, after the decision in the Bermuda court in September, 1890, that the sale of the ship was null and void, the libelants seem to have thought a suit against the bark desirable, and with that view on March 10, 1891, cabled to the respondent in reference thereto. On March 17, 1901, before the year had expired, the respondent replied saying:

"Your cable not understood by us. We will say, however, that we have no objection to your suing the Sempre Avanti and that your doing so will not prejudice any claim you may have against us."

Suit in rem was thereupon brought by the libelants in the French court at Oran, Algiers. If successful, it would have inured pro tanto to the respondent's benefit. But the decision (August 28, 1891) was in favor of the vessel and her owners, holding, contrary to the decision in Bermuda, that the sale of the vessel was valid.

It could not have been the expectation of either party that, during the pendency of that suit, any action should be instituted against the respondent. Both must have understood the contrary; and the provision that such suit should be "without prejudice" to any claim against the respondent, must have been understood as a waiver of the time limit, since no determination of that suit could possibly have been anticipated within the remaining period of one year from the loss. The decision in August, 1891, was in fact considerably after the year had expired.

Three months later in December, 1891, a formal demand of payment was made on the respondent by the libelants' present attorneys, and the respondent in reply (December 28, 1891) requested them to communicate with Walker & Hughes, in whose hands, it was stated, the matter was placed. The demand, it was stated, had received "careful attention"; yet there was no intimation that the claim was barred by the time limit in the policy, and the only defense indicated

was that "so far as we are aware there was no loss to cargo under the conditions of the policy."

During nearly all of 1892 these negotiations were pending; there were many and frequent interviews and communications with Walker & Hughes, the respondent's representatives; numerous documents were supplied to them on their call, proofs of loss served on August 4, 1892, and further new documents procured at their request and with difficulty and expense, in the endeavor to procure a settlement. It was not until October 19, 1892, that the claim was definitely rejected; and neither then nor at any time, so far as the evidence shows, was any reference made to the time condition of the policy, until it was finally set up for the first time in the answer in this cause. Upon these several grounds I must hold that this defense has been waived, within the authorities above cited.

Upon the merits but little evidence has been introduced by the defense. The libelants' claim is not for a loss occasioned by the master's sale of the oil in order to raise funds; but for actual damage to the 5,000 cases of oil occasioned by sea perils, in the form of general average charges, and also of particular average and special charges thereon, exceeding in all 50 per cent. of its value, and therefore a constructive total loss under the policy. The only question is, how much loss by perils within the policy have the libelants established? If they have shown a loss above 50 per cent. of the value of the oil at Bermuda, they are entitled to a full recovery of $5,600, the value insured, as for a constructive total loss, upon due abandonment. I think both the loss and the abandonment are sufficiently established by the proofs.

2. Abandonment. The intent to abandon was notified to the respondent apparently as soon as the intelligence of the loss was received. This intention was stated in the libelants' letter of July 21, 1890, as above stated, and inquiry was made

"Whether we must make an abandonment by judicial way, or if our present letter will do?"

The respondent's agents in answer say:

"We are instructed to advise you that the Western company do not admit any liability for the goods in consequence of the sale to raise funds; these being the circumstances under which your goods failed to reach their destination, we do not see that we can do any more than pass on this information to you."

The libelants' letter was a distinct tender of abandonment, with a request for an answer whether a more formal notice was desired. The company's answer ignores the informal tender, and in effect, by its silence, says, "abandonment is immaterial; we reject your claim altogether." This certainly sufficiently excuses any more formal tender at that time. On November 6, 1890, as above stated, formal abandonment was made for the benefit of all the underwriters, and this was confirmed by the libelants' cablegram of November 28th to the respondent, with notice that "the bark was at New York and that the respondent might take any measures it might deem best in its behalf." This was sufficient; it gave to the respondent every right that the assured possessed either of property, or right of property in

rem or right of action in personam against ship or owners. Nothing had been lost by any change in the situation since the informal tender on July 21st, nor had the respondent in any way been prejudiced in the meantime.

3. Amount of loss. The bark being disabled through severe weather and sea perils, was necessarily towed into St. Georges, a port of distress, where in order to be repaired for the purpose of continuing the voyage, she had to be put on the dry dock; and for that purpose her cargo had to be unloaded and warehoused, and afterwards reloaded for the voyage. The cost of the actual repairs but slightly exceeded the estimates; and so far I do not see any evidence of unfair dealings.

With a cargo apparently worth at least $30,000, to repair the ship in order to continue the voyage, was in the ordinary course of the master's right and duty. When this was determined on, the salvage suit had not been decided, and it could not have been anticipated that bottomry for the necessary funds could not be obtained. The cargo at that time was apparently in fair condition and fit for reshipment. Up to the time when the efforts to obtain bottomry failed, about June 16th, I see no grounds in the evidence for doubting the propriety and the entire good faith of the master's proceedings.

From this it follows that the respondent upon the general terms of its policy insuring against sea perils, is directly answerable to the libelants for all general average charges assessable upon the oil. Dickenson v. Jardine, L. R. 3 C. P. 639; International Nav. Co. v. Atlantic Mut. Ins. Co. (D. C.) 100 Fed. 304. The general average charges include the decree for salvage with its attendant costs and charges, inward pilotage, towage, ship's new material used up in the salvage work and in rigging up the temporary steering gear, light dues, pumping, discharge of cargo, surveys, agents' expenses, brokerage and commissions, amounting in all to about £2,900, of which the bark's proportion is about $1,900.

The defendant is further answerable under the policy for the special charges, and for the particular average charges against the oil incurred in good faith in the port of distress, as a consequence of the sea perils undergone, and which had compelled the vessel to put in there, except in so far as such charges are excepted in the certificate issued under the policy.

4. Leakage. It is claimed that loss by leakage, as particular average, is excepted by the policy. The certificate by which the libelants were insured, issued under the standing policy No. 1,236 to Maury & Donelly for whom it might concern, contained the following clauses:

"(a) Claims to be adjusted according to the usages of Lloyds, and the special conditions of this insurance."

"(b) Free of particular average unless vessel be stranded, sunk, burned or in collision with another vessel."

"(c) Insured under policy No. 1,236. * * * It is understood and agreed that this certificate represents and takes the place of the policy, and conveys all the rights of the original policy holder for the purpose of collecting any loss or claim, as fully as if covered by a special policy direct to the holder of this certificate."

Policy No. 1,236 contained no exception of particular average except the following:

"(d) Not liable for leakage of molasses or other liquids, unless occasioned by stranding."

The vessel having stranded and thereby suffered considerable damage, clause (b) of the certificate no longer affects the case. 2 Pars. Ins. 629; London Assur. Co. v. Companhia De Moagens Do Barreiro, 167 U. S. 149, 17 Sup. Ct. 785, 42 L. Ed. 113. But the respondent contends that clause (d) of the policy still remains applicable. If clauses (b) and (d) covered the same subject only, I should think that under the provisions of the above clause (c), clause (b) of the certificate superseded the earlier clause (d) of the policy. But clause (b) is a general one, covering particular average losses of all kinds, and is quite different in its purpose from that of the special clause (d), which refers to leakage only. I think the latter clause, therefore, remains in force, and that any loss by leakage alone, not due to stranding, must, therefore, be excluded. This clause, as I understand it, excludes not only leakage from ordinary or unknown causes, but also leakage arising as a consequence of severe weather, rolling or pitching of the vessel, or any other sea peril, except stranding alone. Indemnity Mut. Marine Assur. Co. of London v. United Oil Co. (D. C.) 88 Fed. 315, 316.

But the evidence indicates, I think, that whatever the loss from mere leakage, it was mainly, if not wholly "occasioned by stranding." In entering St. Georges, the vessel through her unmanageability, was stranded and pounded for half an hour in a strong wind and high seas on a coral reef. This naturally damaged her rudder post, opened seams, produced leaks letting water into the hold, and tore off her metaling, and thereby evidently caused the greater part of the expense and delay in repairing at St. Georges. But for the stranding, the delay would have been comparatively short, and the unloading of the oil and docking would apparently have been unnecessary. The master in his application to the consul on March 29th for permission to unload cargo and dock the ship, states the necessity for this as arising entirely from her stranding. He says:

"The bark having struck the reef and by reason of damage to the bottom sustained at sea on this voyage causing her to leak, and requiring extensive repairs to bottom, it has become necessary to effect repairs on dry dock to discharge cargo, as recommended by official survey."·

According to the uncontradicted testimony of many experienced witnesses, moreover, including Captain Cann, the surveyor of the marine board, the damage arose from contact with sea water, detention in a tropical climate and frequent handling; and those causes were mainly, if not wholly, "occasioned" by the stranding; because it was the stranding that caused the chief damage and the chief delay for repairs. This is further confirmed by the testimony that on arrival at St. Georges and on first warehousing the cargo, it appeared to be in good condition. The leakage, whatever it was, and the subsequent bad condition of the cases, was therefore not due to any original defects in the cases or insufficiency for ordinary transportation, nor to the loss of the rudder; but to the leaks, the ship's long

delay and the frequent handling through unloading and reloading, which were all caused chiefly by the stranding.

The libelants contend that there was comparatively little actual loss of oil from leakage, and that the chief element of damage consisted in such "deterioration of the packages as to threaten total early destruction, and to necessitate immediate and costly reconditioning and repacking." The evidence leaves no doubt of this condition of the cases at the time of the sale on July 8th, and that the oil could not then have been transported to Europe without very large loss; so that the sale of the oil in Bermuda had at that time become best, as above stated, for all concerned. But the testimony of the witnesses, with one exception, so far as I can discover, does not distinguish between this element of damage and the actual loss of oil by leakage. The damage to the various lots sold is stated in gross, ranging from 20 to 40 per cent., and embraces both elements without distinction.

The witness Forster, however, who bought 1,000 cases at 3–3, states that the oil if in sound condition would have been worth from five to six shillings per case, and that in his lot the loss from lack of quantity in the cases was about 25 per cent., as he estimates. If the oil was worth in marketable condition $1.37 per case, there was a loss in condition, after deducting 25 per cent. for leakage, of 28 cents per case on his lot, and a larger loss, aside from leakage, on the rest; making in all over $1,500 loss besides that from leakage.

The loss in value due to depreciation in the packages or marketable condition, caused by previous contact with sea water, repeated handling, and the necessary delay while repairing the ship's damages arising from sea perils in a port of distress, whether treated as particular average or general, is covered by the policy. This loss together with leakage, if that be included, was considerably above $2,000, adopting the prices realized at the sale as the fair value of the oil in its condition at that time; and for the reasons above stated, there is no injustice in adopting those prices as the fair value. The respondent had abundant opportunity to protect itself, and the oil actually brought more than it was apparently willing to give.

The special charges under the English rule for storage, reloading, colonial tax and charges incident to the sale, amounted to about $600, and the above three elements of loss would amount in all to a loss of over $4,500, or much more than 50 per cent. of the sound value of the oil. If loss by actual leakage be deemed wholly excluded by the policy, contrary to the view above expressed, and that loss be reckoned at 25 per cent., according to Forster's testimony, the loss from unmarketable condition would still be upwards of $1,500; and this with the other two items would make an aggregate of over $4,000,—considerably exceeding 50 per cent. of the sound value.

If the proofs presented to the court left any reasonable doubt whether the oil's share of the general average expenses, together with its own particular average and the special charges that are undoubtedly covered by the policy, amounted to 50 per cent. of its value, the proper course would be to send this matter to a referee for careful adjustment by an expert. But there seems to me no doubt

that the loss on the oil, even with all the limitations that can be admitted as reasonably possible, are in excess of 50 per cent. The adjustment of general and particular average is, moreover, a work of great detail, and would involve so much further expense and delay, that without reasonable grounds for requiring it, no such reference should I think be ordered, but a decree entered for the libelants as for a constructive total loss, with interest and costs.